THE EUROPEAN COMMUNITY
Plaintiff,

v.

RJR NABISCO, INC., et
al., Defendants.

Department of Amazonas,
et al. Plaintiffs,

v.

Philip Morris Companies, Inc.,
et al., Defendants.

Nos. 00–CV–06617, 00–CV–
02881 (NGG)(VVP).

United States District Court,
E.D. New York.

July 16, 2001.

458

Krupnick Campbell Malone Roselli, Buser Slama Hancock Mcnelis, Liberman & Mckee, P.A., Kevin A. Malone, Carlos A. Acevedo, Fort Lauderdale, FL, Speiser, Krause, Nolan & Granito, John J. Halloran, Frank H. Granito III, Kenneth P. Nolan, Frank H. Granito, Jr., New York

City, Sacks & Smith, L.L.C., John K. Weston, Andrew B. Sacks, Philadelphia, PA, for Plaintiffs.

Edward Farrell, Principe de Vergara 17, Piso 8, Madrid, Spain, for the European Community.

Arnold & Porter, Craig A. Stewart, New York City, Irvin B. Nathan, Kitty A. Behan, Christopher D. Mann, Evelina J. Norwinski, Washington, DC, for Philip Morris Incorporated, Philip Morris International, Inc., Philip Morris Products, Inc., Philip Morris Latin American Sales Corporation, and Philip Morris Duty Free, Inc.

Cravath, Swain & Moore, Ronald S. Rolfe, Max R. Shulman, Dan Rotterstreich, New York City, for British American Tobacco (Investments) Limited and British American Tobacco (South America) Ltd.

Simpson Thacher & Bartlett, Mary Elizabeth McGarry, New York City, for B.A.T. Industries, Inc.

Kirkland & Ellis, Peter A. Bellacosa, Marjorie Press Lindblom, New York City, David M. Bernick, Jonathan C. Bunge, Chicago, IL, for Brown & Williamson Tobacco Corporation and Batus Tobacco Services, Inc.

Jones, Day, Reavis & Pogue, Mark R. Seiden, New York City, William T. Plesec, North Point, Cleveland, OH, Timothy J. Finn, Christopher F. Dugan, Washington, DC, for RJR Nabisco, Inc., R.J. Reynolds Tobacco Company, R.J. Reynolds Tobacco International, Inc., Nabisco Group Holdings Corp., R.J. Reynolds Tobacco Holdings, Inc., and RJR Nabisco Holdings Corp.

Sullivan & Heard, C. Stephen Heard, Jr., New York City, for Japan Tobacco Inc.

## MEMORANDUM AND ORDER

GARAUFIS, District Judge.

Now before this court are Defendants' motions to dismiss the complaints in the above-captioned cases, and to deconsolidate those cases; and a motion by the European Community to amend its complaint. For the reasons set forth below, Defendants' motion to de-consolidate the cases is granted; Defendants' motion to dismiss the complaint filed by the European Community is granted; Japan Tobacco, Inc.'s motion to dismiss is denied as moot; and the European Community's motion to amend its complaint is denied. The Defendants' motion to dismiss the complaint filed by the Departments of the Republic of Colombia will be decided in a separate memorandum and order, to be issued at a later date.

## I. Introduction

The above-captioned cases, which are distinct and have been consolidated for administrative purposes including the resolution of the motions now before this court, have been brought by the European Community[1] (the "EC Case") and by numerous political subdivisions of the Republic of Colombia[2] (the "Amazonas Case") against

1. The European Community is "a governmental body created as a result of collaboration among the majority of the nations of Western Europe, more specifically, Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, Sweden, and the United Kingdom." (EC Compl. ¶ 6.) The EC brings this case "acting on its own behalf and on behalf of the Member States it has power to represent." (*Id.* at 1.)

2. Plaintiffs in the Amazonas case include, in addition to the Santa Fe De Bogotá Capital District, the Departments of Amazonas, Antioquia, Atlantico, Bolivar, Boyaca, Caqueta, Casanare, Cesar, Choco, Cordoba, Cundinamarca, Huila, La Guajira, Magdalena, Meta, Nariño, Norte de Santander, Putumayo, Quin-

major tobacco product manufacturers. The Defendants in the EC Case include Philip Morris Companies, Inc. and several of its affiliates [3] (collectively "Philip Morris"), RJR Nabisco, Inc.,[4] several companies related to R.J. Reynolds Tobacco Company,[5] and Japan Tobacco, Inc. (collectively "RJR").[6] The Defendants in the Amazonas case include Philip Morris Companies, Inc. and several of its affiliates [7] (collectively "Philip Morris"), BAT Industries P.L.C. and several of its affiliates,[8] and Brown & Williamson Tobacco Corporation [9] (collectively "BAT").

Plaintiffs in these cases seek recovery against major tobacco product manufacturers and related entities for damages sustained as a result of three separate conspiracies, all related to the smuggling of contraband cigarettes into the EC and Colombia, as follows:

1. a conspiracy involving, in the EC Case, RJR and various co-conspirators, including RJR's distributors, shippers, currency dealers, smugglers, lobbyists, customers, agents, consultants and others to smuggle RJR's tobacco products into the EC and the territories of various EC Member States and to launder the proceeds of drug trafficking; BAT is alleged to head a similar conspiracy with the same objective in the Amazonas Case.

2. a conspiracy involving, in the EC Case, Philip Morris and various co-conspirators, including Philip Morris's distributors, shippers, currency dealers, smugglers, lobbyists, customers, agents, consultants and others, to smuggle Philip Morris's tobacco products into the EC and the territories of various EC Member States and to launder the proceeds of drug trafficking; Philip Morris is alleged to head a similar conspiracy with the same objective in the Amazonas Case.

3. a conspiracy, in the EC Case, among RJR and Philip Morris employing various means, including fixing the price of smuggled cigarettes, to implement and conceal the first two conspiracies; BAT and Philip Morris are alleged to have launched a similar conspiracy with the same objective in the Amazonas Case.

In each case, Plaintiffs' claim that they are entitled to recover under both the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and under various state common law causes of action, including fraud, public nuisance, unjust enrichment, negligence and negligent misrepresentation.

Plaintiffs in both cases allege that the conspiracies described above resulted in the following damages:

1. lost tax revenues derived from the sale of cigarettes that would have been paid if the smuggled cigarettes

---

dio, Risaralda, Santander, Sucre, Tolima, Valle del Cauca and Vaupes. (2d Am. Amazonas Compl. ¶ 6.) The Departments are autonomous from the Republic and each "has rights and responsibilities comparable to that of a state of the United States." (*Id.*) The Republic of Colombia is not a party to this action.

**3.** (*See* EC Compl. ¶¶ 16–20.)

**4.** (*See* EC Compl. ¶ 7.)

**5.** (*See* EC Compl. ¶¶ 8–13.)

**6.** (*See* EC Compl. ¶¶ 14–15.)

**7.** (*See* 2d Am. Amazonas Compl. ¶¶ 7–15.)

**8.** (*See* 2d Am. Amazonas Compl. ¶¶ 16–25.)

**9.** (*See* 2d Am. Amazonas Compl. ¶¶ 19–20.)

had entered Plaintiffs' territories legally;

2. money and property that Plaintiffs would have obtained with revenues derived from the lawful sale of cigarettes;

3. money spent by Plaintiffs to recover funds lost as a result of Defendants' illegal activities, including money spent to combat cigarette smuggling;

4. illegal profits resulting from Defendants' illegal sale of contraband cigarettes and participation in illegal money laundering;

5. damages resulting from Defendants' creation of a public nuisance.

## II. Deconsolidation

 This memorandum and order dismissing the EC Complaint disposes of the EC Case only, which was consolidated with the Amazonas Case pursuant to Fed. R.Civ.P. 42(a) on November 27, 2000. (*See* Nov. 27, 2001 Tr. at 39.) On that date, I explained that the purpose of consolidation was to simplify this complex litigation to the fullest extent practicable; I further emphasized that my decision to consolidate the Amazonas and EC Cases was not final, and that I would revisit the issue as appropriate. (*Id.*) "[T]he decision to consolidate is discretionary with the court and turns essentially on balancing the time that might be saved against the possible delay or prejudice involved in consolidation." *Transeastern Shipping Corp. v. India Supply Mission,* 53 F.R.D. 204, 206 (S.D.N.Y.1971); *see also Kelly v. Kelly,* 911 F.Supp. 66, 69 (N.D.N.Y.1996). Consolidation promoted the fair and efficient resolution of various motions and house-

keeping issues that have come up concerning these cases, including the motions to dismiss now before this court. Continued consolidation, however, will delay the resolution of these cases unnecessarily, and the cost of such delay is not outweighed by the fact that the EC and·Amazonas Cases to some extent share common legal and factual issues. Defendants' motion for deconsolidation is therefore granted. The Amazonas Case shall re-acquire its original docket number, 00–CV–02881; the EC Case shall retain docket number 00–CV–06617.

## III. Standard of Review

In reviewing a motion brought pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences from those allegations in the light most favorable to the plaintiff.[10] *See Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). The complaint may be dismissed only if "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hoover v. Ronwin,* 466 U.S. 558, 587, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In deciding such a motion, the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (internal quotation marks and citations omitted).

---

**10.** This court's obligation to accept plaintiff's allegations as true and to draw all reasonable inferences in plaintiff's favor is identical under Fed.R.Civ.P. 12(b)(1). *See, e.g., Jaghory v. N.Y. State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997).

## IV. The EC Complaint

### A. RJR's Involvement in Smuggling

Plaintiff alleges, in general terms, that RJR has been actively involved in smuggling contraband cigarettes into the EC and numerous countries outside of the EC for many years; that RJR's smuggling activity spans the globe, and includes conduct and effects in the Eastern District of New York and throughout New York State; that RJR entered into an agreement with its distributors, customers, agents, consultants and other co-conspirators to participate in a common scheme to smuggle contraband cigarettes into the EC; that RJR conspired with Philip Morris to promote and conceal its and Philip Morris's smuggling activities by means including, *inter alia,* fixing the price of contraband cigarettes; and that RJR agreed with its co-conspirators to commit tortious acts in order to conduct its smuggling scheme. Plaintiff further alleges that it has suffered economic harm, in the forms described *supra,* as a result of Defendants' participation in cigarette smuggling.

Plaintiff alleges that each of the named RJR Defendants participated in the conception and execution of RJR's conspiracy to smuggle cigarettes into the EC. At all relevant times, RJR and its co-conspirators communicated using both interstate and international wires and mail, on many occasions, in order to carry out nearly every aspect of the alleged scheme. The mail and wires were used in connection with, *inter alia,* the following conspiratorial activities: arranging for the sale, shipment, billing, payment and accounting of contraband cigarettes; arranging for the return of smuggling proceeds to the United States; preparing and transmitting documents intentionally misstating to authorities of the United States, the EC and the Member States the ultimate destination of cigarettes.

The following is a summary of the Plaintiff's specific factual allegations concerning RJR and Philip Morris's conduct of the conspiracies described above.

### 1. RJR's Participation in Smuggling Cigarettes into Spain

Plaintiff alleges that RJR established the routes and mechanisms by which its cigarettes were (and in some instances continue to be) smuggled into Europe. RJR employees, motivated to some extent by the promise of large bonuses, helped to establish this network. The efforts of one such employee, named Richard Larocca,[11] are described in some detail.

Larocca was involved principally with the smuggling of RJR cigarettes into Spain. RJR recruited Larocca on the basis of his knowledge of the Spanish cigarette market. RJR directed him to increase market share by any means, including smuggling. Larocca provided RJR with information concerning the marketing potential for Winston cigarettes in Spain. He also provided marketing and other information to cigarette smugglers in order to ensure the efficiency of their operations.

Through employees such as Larocca, RJR maintained control over smuggling by, for example, requiring smugglers to keep logs indicating the amount, destination, and price ultimately paid for illegal cigarette shipments. RJR indicated that if any smuggler did not keep adequate records of shipments, RJR would discontinue its relationship with that smuggler. Ac-

---

**11.** Plaintiff alleges that Larocca is currently an employee of Japan Tobacco, Inc. and at that company "fulfills much the same role ... that he fulfilled for [RJR] prior to 1999." (EC Compl. ¶ 32x.)

cording to an RJR policy, implemented in the mid- to late 1990s, RJR would refuse to deal with any distributor who failed to verify to RJR the identity of the final customer. By means of these practices, RJR should have been able to ascertain whether or not its cigarettes had reached their intended destination, and by extension, whether or not its cigarettes had ultimately been sold legally.

RJR went to considerable lengths to ensure control over cigarette smuggling. When, for example, RJR detected that large volumes of unauthorized cigarettes had been smuggled into Spain, without RJR's "authorization," RJR purchased such cigarettes and subsequently required the distributor of these cigarettes to re-purchase them from RJR. The rogue distributor, thus disciplined, then sold the cigarettes to another purchaser for resale into an "authorized" market.

RJR had a separate method for addressing situations in which "unauthorized" smuggled cigarettes were seized by Spanish authorities. In such instances, RJR purchased the seized cigarettes at auction, and then required the smugglers to reimburse RJR for one-half of the price paid at auction. RJR then sold these cigarettes in Spain through legitimate vendors. If the "unauthorized" smuggler refused to reimburse RJR, RJR cut off the smuggler's supply of cigarettes.

As part of its effort to maintain control over smugglers by protecting "authorized" smugglers against their "unauthorized" counterparts, RJR developed a special marketing presentation for Winston cigarettes. Cigarettes marketed with this presentation became known to Spanish consumers as "patanegra." RJR used the patanegra marketing presentation to ensure that "approved" smugglers could maintain their competitive edge over "unauthorized" smugglers who did not have

access to, and thus could not sell, patanegra Winstons.

Throughout the 1990s until at least 1999, patanegra Winstons were smuggled into Spain in an elaborate shipping scheme. First, RJR sold them in large quantities in Miami, Florida. Next, they were shipped from RJR's North Carolina production facility to customers located in Panama. These cigarettes were then re-shipped from Panama to Rotterdam, Holland. From Rotterdam, the cigarettes were delivered by truck to Barcelona, Spain.

Because cigarettes cannot be shipped legally from Rotterdam to locations within the EC, smugglers were required to obtain fraudulent transit documents indicating an ultimate destination outside of the EC. Typically, these fraudulent documents indicated the Canary Islands as the cigarettes' ultimate destination. In time, as additional requirements, such as the posting of large bonds, were imposed upon shippers of cigarettes to guard against smuggling, forged shipping documents indicated Eastern European destinations rather than the Canary Islands as the ultimate destination.

Cigarettes shipped by truck from Rotterdam were then unloaded in Barcelona and sold illegally; other goods, accompanied by the fraudulent transit documents, were then shipped in place of the cigarettes to destinations in Eastern Europe. Upon arrival, smugglers processed the transit documents as if the shipments had contained the cigarettes originally sent from North Carolina via Rotterdam.

Plaintiff claims that RJR executives charged a kickback of five to fifteen dollars per case of cigarettes in exchange for selling patanegra Winston cigarettes into the smuggling network. These executives further encouraged smugglers and their associates to buy more cigarettes by offering "discounts" on the kickbacks in exchange

for purchasing larger quantities of cigarettes. In addition, Plaintiff alleges that certain smugglers paid RJR executives to protect their territories from infringement by other smugglers.

Plaintiff claims that the smuggling of patanegra Winstons could not have occurred except with RJR's complicity. The creation of the patanegra presentation for Winston cigarettes sold in Spain is alleged to be a "but-for" cause of smuggling RJR cigarettes into the EC, as is RJR's providing large quantities of cigarettes for sale through its Miami, Florida office.

RJR allegedly also participated in smuggling cigarettes into Spain from the United Kingdom. Through intermediary distributors located in Panama and elsewhere, RJR supplied large volumes of cigarettes manufactured in the United States to a group of six related companies in the United Kingdom (the "UK Group"), including a business known as Entire Warehousing, that smuggled RJR cigarettes into Spain. RJR's involvement with the UK Group extended from at least October, 1995 through April, 1997. Plaintiff alleges that RJR supplied cigarettes to these companies through distributors in Panama in order to evade detection.

The UK Group falsified European customs documents to indicate that cigarette shipments were destined for locations outside of the EC. RJR was aware that large volumes of cigarettes sold to the distributors in connection with this scheme did not reach the markets for which the cigarettes were purportedly destined, but rather ended up sold on the black market in Spain. RJR nevertheless continued to supply these distributors with large numbers of cigarettes.

RJR employed additional smuggling channels originating in Charleston, South Carolina and Savannah, Georgia. In or about November, 1997 RJR prepared a shipment of eighty million of its cigarettes from Charleston and Savannah to Europe. RJR prepared shipping documents falsely indicating that the cigarettes were destined for a particular company in Greece. Plaintiff alleges that RJR either knew or should have known that this company had neither the capability nor the intention to receive such a large shipment. RJR prepared bills of lading in connection with the shipment instructing that no reference be made to, *inter alia,* the number of the cigarettes contained in the shipment or the brand name of the cigarettes shipped. RJR or its agents filed documents with the U.S. Bureau of Alcohol, Tobacco and Firearms (the "ATF") that intentionally misstated the intended destination of the shipment in order to mislead the ATF.

### 2. RJR's Awareness of Cigarette Smuggling

Plaintiff imputes awareness of the smuggling to RJR by virtue of RJR's refusal to discontinue selling to individuals known to participate in cigarette smuggling. For example, RJR continues to supply cigarettes to Michael Haenggi, even though Haenggi has stated that he frequently supplied Winston cigarettes to smugglers, who then illegally introduced those cigarettes into the Spanish market. Haenggi has also stated that in one instance he sold 160 million cigarettes, mostly manufactured by RJR, to a company in Panama, which in turn smuggled those cigarettes into Spain. Haenggi has also stated that on a separate occasion he sold 220 million cigarettes, again mostly manufactured by RJR, to a Caribbean company, which in turn smuggled those cigarettes into Spain.

RJR has also declined to curtail shipments to specific customers even though one of its distributors expressly informed RJR that these customers were smuggling cigarettes into the EC. On May 26, 1997

Belgium Pakhoed N.V. ("Pakhoed"), one of RJR's primary agents for the storage and handling of cigarettes in the EC, notified RJR that numerous RJR customers were smuggling cigarettes and were "involved in major EC-fraud." Pakhoed thus refused to load cigarettes onto ships operated by such customers. Rather than curtailing further sales to such customers, RJR responded by redirecting its supply to these customers through Cyprus. RJR continues to supply these customers, despite Pakhoed's warning.

In another such example, Spanish customs authorities in April, 1997 seized a shipment of twenty-two million cigarettes, purportedly destined for locations outside of the EC. When EC officials requested information from RJR, RJR refused to comply with the request, arguing that such disclosures would violate Swiss secrecy laws.

Reports of the activities of an unnamed major customer of RJR (responsible for smuggling large quantities of cigarettes into Spain), further indicates RJR's knowledge of, and tacit support for, its customers' cigarette smuggling. During all or part of the time that this customer was engaged in smuggling, he was also suspected by Spanish authorities of narcotics trafficking. In October, 1999 he eluded Spanish authorities just as they were planning to arrest him on charges of hashish smuggling. Because several of his encounters with Spanish authorities drew publicity, RJR knew or should have known of this customer's alleged involvement in narcotics trafficking.

Finally, RJR's own shareholders, in 1998 and 1999, allegedly proposed resolutions at the RJR annual meeting that put the RJR board of directors on actual notice that RJR was doing business with notorious cigarette smugglers. Plaintiff alleges that through these and other events RJR is on notice that its cigarette customers are involved in illegal smuggling.

### 3. Steps Taken By RJR to Facilitate Cigarette Smuggling

Moreover, Plaintiff alleges RJR took affirmative steps to facilitate cigarette smuggling. For example, RJR regularly packaged cigarettes specifically to meet the needs of smugglers. RJR also routinely attached tax stamps or counterfeit tax stamps to cigarette shipments at the factory. Without these stamps, the cigarettes could not be shipped to certain destinations. RJR also affixed certain labels and health warnings to ensure the value of the cigarettes at their ultimate destination and designed special cigarette packaging to prevent customs officials from identifying smuggled cigarettes.

Plaintiff further alleges, in addition to the means just described, that RJR provided smugglers with direct assistance in the form of marketing information, including pricing information, specifications concerning which products were in demand, and the volume of cigarettes needed to meet clients' requirements.

According to Plaintiff, RJR also routinely invokes Swiss secrecy laws to thwart detection of its participation in cigarette smuggling. Plaintiff alleges that RJR executives have arranged for payment to smugglers from accounts located in Switzerland. Plaintiff further alleges that RJR relocated records concerning nearly all of its illegal activities worldwide to Geneva, Switzerland in order to evade the efforts of law enforcement to detect cigarette smuggling.

### 4. RJR Conspired With Other Tobacco Producers to Obstruct EC Efforts to Combat Cigarette Smuggling

In addition to ignoring, on the one hand, ample indications that it transacts business

with cigarette smugglers and facilitating, on the other hand, the efforts of cigarette smugglers, RJR also acted in concert with Philip Morris and other tobacco producers to conceal its participation in cigarette smuggling though the formation and manipulation of numerous industry groups and associations. RJR and Philip Morris formed, managed and directed the affairs of industry groups including the International Committee on Smoking Issues, the EEC Task Force on Consumerism (the "EECTF"), the International Duty Free Confederation, the Confederation of European Community Cigarette Manufacturers Ltd. ("CECCM") and CECCM's Duty Free Study Group.

The EECTF was formed by Philip Morris and other tobacco companies on January 19 and 20, 1978. The objective of the EECTF is to thwart EC efforts to regulate tobacco advertising and distribution, and to address the health effects of smoking. Likewise, RJR has utilized the CECCM to conceal the true causes of cigarette smuggling. The CECCM asserted in a 1995 publication that high cigarette taxes had created an enormous black market for cigarettes. The CECCM publication did not, however, disclose RJR's or any other tobacco producer's involvement in this black market.

Plaintiff alleges that RJR's use of tobacco industry groups and their false representations obstructed government oversight and misled the public into believing that high taxes cause the black market for contraband cigarettes, when in fact RJR, Philip Morris and other tobacco producers had conspired to generate and maintain cigarette smuggling operations. The EC reasonably relied on the tobacco industry groups' misrepresentations in accounting for the cigarettes in question and assessing customs duties on cigarettes entering the EC.

### 5. RJR's Involvement in Money Laundering

Plaintiff alleges that RJR executives and employees, and in particular Richard Larocca, traveled to locations in the Caribbean and Central America for the purpose of meeting and negotiating business agreements with companies and individuals that RJR knew or should have known were money launderers. RJR's employees and agents also developed business relationships with individuals in Colombia that RJR knew or should have known were directly involved in narcotics trafficking.

In or about the early 1990s, U.S. authorities froze bank accounts in Miami, Florida owned by various distributors of RJR cigarettes because funds credited to those accounts represented laundered drug money. RJR was thus on notice that its distributors had been involved in laundering narcotics proceeds.

Plaintiff alleges that RJR overlooked its distributors' ties to money launderers and actively developed such relationships in order to continue selling large volumes of cigarettes to money launderers. Plaintiff further alleges that cigarettes sold to money launderers were ultimately smuggled into the European Union.

RJR's awareness of the link between its distributors and money launderers and drug traffickers was furthered by the August 15, 1994 report of the Coalition Against Crime and Tobacco Contraband, a group funded in part by RJR. The report concluded that drug traffickers purchased cigarettes for sale in Colombia as a means of laundering their illegal profits.

### B. Philip Morris's Involvement in Smuggling

Plaintiff alleges in general terms that Philip Morris, like RJR, has been actively

involved in smuggling contraband cigarettes into the EC and numerous countries outside of the EC for many years; that Philip Morris's smuggling activity spans the globe, and includes conduct and effects in the Eastern District of New York and throughout New York State; that Philip Morris entered into an agreement with its distributors, customers, agents, consultants and other co-conspirators to participate in a common scheme to smuggle contraband cigarettes into the EC; that Philip Morris conspired with RJR to promote and conceal its and RJR's smuggling activities by means including, *inter alia*, fixing the price of contraband cigarettes; and that Philip Morris agreed with its co-conspirators to commit tortious acts in order to conduct its smuggling scheme. Plaintiff further alleges that it has suffered economic harm, in the forms described *supra*, as a result of Defendants' participation in cigarette smuggling; and that Philip Morris agreed with its co-conspirators to commit tortious acts in order to conduct its smuggling scheme.

Plaintiff alleges that each of the named RJR Defendants participated in the conception and execution of RJR's conspiracy to smuggle cigarettes into the EC. At all relevant times, Philip Morris and its co-conspirators communicated using both interstate and international wires and mail, on many occasions, in order to carry out nearly every aspect of the alleged scheme. The mail and wires were used in connection with, *inter alia*, the same conspiratorial activities as those listed above in connection with the RJR use of the mail and wires.

The following is a summary of the Plaintiff's specific factual allegations concerning Philip Morris's participation in cigarette smuggling.

### 1. Philip Morris's Participation in Smuggling Cigarettes into the EC

Plaintiff describes Philip Morris's creation of a circuitous distribution chain through which it conducts the majority of its sales in Europe and South America. The ultimate purpose of these convoluted arrangements is to conceal the sale of cigarettes to distributors known to be associated with cigarette smugglers in the EC. These evasive distribution methods also serve to increase market penetration and market share by introducing billions of contraband Philip Morris cigarettes into the EC at prices substantially below those paid for legitimate imports.

Philip Morris has long maintained relationships with various agents and distributors in Central America and the Caribbean who have been investigated, and in some cases indicted, by U.S. authorities for money laundering. Rather than sever these relationships, Philip Morris established a covert arrangement for selling cigarettes to such entities. According to Philip Morris policy, certain customers are required to purchase cigarettes through offices in remote locations, such as Paraguay. Philip Morris prohibits written purchase orders at these offices, presumably to avoid leaving a paper trail. The offices then forward the orders to Maraval, a company based in Basel, Switzerland. A second Basel company, Weitnauer Services, Ltd. ("Weitnauer"), then arranges for delivery of the cigarettes. Plaintiff alleges that the sole purpose of this complex procedure for ordering, payment and delivery of cigarettes was to conceal from authorities Philip Morris's involvement in the sale of cigarettes into smuggling channels reaching, among other places, the EC. Plaintiff further alleges that Philip Morris controlled the sale of all cigarettes sold by the various agents and distributors involved in this chain.

Like RJR, from at least October, 1995 through April, 1997, Philip Morris supplied large volumes of cigarettes to a U.K. smuggling group that included Entire Warehousing. This smuggling group created false documents so as to defraud customs officials and create the appearance that Philip Morris cigarettes would be exported to destinations outside of the EC, such as Morocco, Mozambique and Angola, when in fact the cigarettes were smuggled to EC countries, such as Portugal. Philip Morris sold its cigarettes to intermediary distributors knowing that they would be purchased by this smuggling group and also that they would not reach the markets for which the distributors had indicated to Philip Morris they were intended. The cigarettes smuggled by this group were manufactured in the United States, and orders for these cigarettes were placed with Philip Morris in the United States.

Throughout the 1990s, Philip Morris shipped large volumes of cigarettes to smugglers located in certain free trade zones, such as the Colon Free Trade Zone (the "CFTZ") in Panama. A substantial percentage of the cigarettes shipped to such destinations was ultimately smuggled into the EC. Philip Morris' purpose in shipping cigarettes through free trade zones such as the CFTZ was, as in the case of the distribution route described *supra*, to take advantage of secrecy laws (such as those of Panama) and thus to prevent scrutiny of cigarette shipments by law-enforcement.

On several occasions in 1999 and 2000, Philip Morris notified prosecutors and customs officials within the government of Panama that it had no authorized dealer in the CFTZ. Philip Morris nevertheless continued the clandestine sale of its products to smugglers in the CFTZ.

For example, Philip Morris World Trade S.A. sold 440 cases of its cigarettes to Weitnauer on January 17, 2000. Philip Morris claims to have no knowledge of the ultimate destination of these cigarettes. The delivery note, however, reflecting the delivery of the cigarettes sold to Weitnauer, was faxed to Marco Shrem, in the CFTZ. Shrem owns Marksman Latin America S.A. ("Marksman"), a company in the CFTZ. In spite of the fact that confirmation of the sale was sent to Shrem, Weitnauer apparently did not sell the cigarettes to Shrem or to any company of which Shrem is an officer. Rather, Weitnauer purportedly sold the cigarettes to a company called Interduty Free Tulcan ("Tulcan") for delivery to a warehouse in Antwerp, Belgium. Tulcan ostensibly shipped the cigarettes to Interduty Free Panama Inc. ("IFP"), located in Panama. Notice of that shipment included notification to a company known as J.F. Hillebrand, U.S.A., Inc., located in Hollywood, Florida. The bills of lading and other pertinent documents relative to this shipment were delivered to Hillebrand on or about February 17, 2000.

These cigarettes were purportedly destined for Ecuador, and the declarations of commercial movement indicated that the cigarettes should have been shipped through the Panama Canal and delivered directly to Ecuador, without being offloaded. When the cigarettes arrived in Panama, however, they were offloaded and placed in a warehouse. Panamanian customs authorities seized the cigarettes because they lacked proper documentation. At the time of seizure, Panamanian authorities discovered Shrem's employees removing the numbers and markings from the cases of Marlboro cigarettes. Even though all documents indicate that the cigarettes are the property of IFP, Shrem has appeared before the Panamanian customs authorities with documentary proof from Philip Morris that the cigarettes be-

long to him and to his company, Marksman. The cigarettes were released to Marksman, and sold to individuals who allegedly took them to Colombia. Plaintiff alleges that because Philip Morris sent the pertinent delivery documents to Shrem, Philip Morris knows the identity of the true ultimate purchaser of these cigarettes. Plaintiff further alleges that Marksman's shipping records show that Marksman's buyers smuggle the bulk of the cigarettes into the EC.

### 2. Philip Morris's Awareness of Cigarette Smuggling

Plaintiff alleges that Philip Morris has sold, and continues to sell, Marlboro brand cigarettes to known smugglers. For example, Philip Morris has sold, and continues to sell, cigarettes to a purchaser named Corado Baianchi, despite Baianchi's public statements that he has acted as a conduit between Philip Morris and smugglers for the distribution and sale of contraband cigarettes into Western Europe, and that he sold Philip Morris cigarettes to smugglers so that those cigarettes could be sold illegally in Italy. Andrew Reitman, a Philip Morris employee in Europe, has acknowledged that Philip Morris knows that smugglers illegally sell its cigarettes in the EC.

Plaintiff additionally claims that Philip Morris has destroyed documents concerning its participation in cigarette smuggling. In the 1990s Philip Morris destroyed documents relating to its so-called "tax-free customers," thereby concealing its involvement in cigarette smuggling. Between November 29, 1988 and December 3, 1988 Geoffrey Bible of Philip Morris convened a series of meetings in Boca Raton, Florida. A key component of the plan allegedly formulated at this meeting was a policy according to which Philip Morris's international legal staff destroyed many boxes of documents related to entities that Philip Morris has described as "tax-free custom-

ers." Pursuant to this policy, on January 8, 1991 alone, Philip Morris destroyed at least 43 cartons of documents related to export sales. Plaintiff alleges that Philip Morris arranged for such document destruction through the use of interstate and international wires, and that the policies are evidence of Philip Morris's direct involvement with smugglers and attempts to conceal such involvement. Plaintiff complains that the destruction of documents has impeded its ability to plead the full extent of the fraudulent scheme.

### 3. Steps Taken By Philip Morris to Facilitate Smuggling

In October, 1990 Philip Morris invited its major customers, including those involved in smuggling, to a conference in Scottsdale, Arizona. Senior Philip Morris executives coordinated and attended the conference using interstate and foreign wires and mails. At this conference, Philip Morris actively promoted the actions of smugglers by providing them with detailed information concerning Philip Morris's marketing and product initiatives.

Philip Morris further facilitated cigarette smuggling by routinely packaging cigarettes specifically to meet the needs of smugglers. Plaintiff alleges that Philip Morris routinely and improperly attached tax stamps or counterfeit tax stamps to cigarette shipments at the factory, and affixed certain labels and health warnings to ensure the value of the cigarettes at their ultimate destination. Philip Morris also designed cigarette packaging in order to make it difficult for customs officials in various countries to identify smuggled cigarettes.

### 4. Philip Morris Conspired with other Tobacco Producers to Obstruct EC Efforts to Combat Cigarette Smuggling

Like, and in concert with, RJR, Philip Morris engaged in a public relations cam-

paign condemning high taxes as the root cause of smuggling. This campaign continues to be a part of a long-term corporate policy carried out by, among others, Philip Morris's External Affairs Group, which sought to minimize excise taxes on cigarettes and to reduce government oversight of the tobacco products business. It is unnecessary to repeat the details of the conspiracy between Philip Morris and RJR, which have been summarized *supra;* it is sufficient to note here that Philip Morris, like RJR, is alleged to have falsely represented, through CECCM, EECTF and other, similar industry groups to various governmental authorities that the tobacco producers were attempting to combat smuggling when, in fact, these companies controlled, directed, encouraged, supported and facilitated smuggling.

Plaintiff does allege certain facts particular to Philip Morris in connection with the conspiracy among tobacco producers. In approximately 1999, Philip Morris entered into written agreements with one or more Member States wherein Philip Morris promised to take a variety of steps to combat smuggling into the EC. Plaintiff alleges that Philip Morris executed these agreements to deceive the EC and its Member States into believing that Philip Morris would help combat smuggling. The EC relied upon Philip Morris's misrepresentations that Philip Morris would help combat smuggling.

Plaintiff also sets forth specific facts regarding Philip Morris's involvement in facilitating and controlling cigarette smuggling by fixing the prices of smuggled cigarettes throughout the world. Plaintiff argues that fixing the price of contraband cigarettes is necessary to prevent undercutting sales of the relatively small amounts of Philip Morris's legally imported cigarettes by unrestrained distribution of low-cost contraband. Philip Morris and another tobacco manufacturer launched a conspiracy to fix prices on smuggled cigarettes on February 14, 1992. On that date, Philip Morris representatives met for the first time with another cigarette manufacturer at John F. Kennedy International Airport in Queens, New York, in order to set forth a strategy to coordinate price-fixing and smuggling of their respective brands. The parties to the initial meeting agreed to conduct further meetings. At a second meeting, on August 5, 1992, Philip Morris representatives discussed price-fixing schemes for both legally sold and smuggled cigarettes.

Agreements between Philip Morris and other manufacturers to fix cigarette prices continued throughout the 1990s, and continue to exist to control the price of smuggled cigarettes throughout the world. Plaintiff alleges that such price-fixing agreements had the effect of fixing prices for cigarettes ultimately smuggled into the EC, because a substantial percentage of cigarettes sold to distributors and smugglers in Central and South America is ultimately smuggled into the EC.

### 5. Philip Morris's Involvement in Money Laundering

Since at least 1991, Philip Morris has sold cigarettes to individuals whom Philip Morris knew to be reputed drug smugglers. At least one such individual stated to U.S. government informants that he was involved in the so-called "pool system" of drug trafficking, whereby he would combine his drug shipments with those of other drug traffickers into a single shipment destined for the United States; he further explained that individual drug traffickers in the United States received the drugs and, having sold them in exchange for U.S. currency, delivered that currency to couri-

ers, approved by drug lords, who would convert the cash into cashier's checks made payable to specific businesses, identified by name in court documents.

In or about the early 1990s, U.S. authorities froze bank accounts in Miami, Florida owned by various distributors of Philip Morris cigarettes because funds credited to those accounts represented laundered drug money. Philip Morris was thus on notice that its distributors had been involved in handling laundered narcotics proceeds.

## V. Subject–Matter Jurisdiction

The Supreme Court has recently admonished the federal courts to refrain from exercising "hypothetical jurisdiction," and to address jurisdictional questions as a "threshold issue." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The Court in *Steel Co.* noted:

> [t]he statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects .... For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has not jurisdiction to do so is, by very definition, for a court to act ultra vires.

*Id.* at 101–02, 118 S.Ct. 1003. Because Defendants argue that the revenue rule deprives this court of subject matter jurisdiction to hear Plaintiff's claims, (*see, e.g.,* Defs.' Mem. in Support of Mot. to Dismiss

Departments' Compl. Under 12(b)(1) and (b)(7) at 26),[12] I address this argument first. Having concluded that the revenue rule is not implicated in this case, I then address the Defendants' arguments concerning Plaintiff's lack of standing under the federal civil RICO statute, 18 U.S.C. § 1964(c).

## A. The Revenue Rule

Defendants argue that this court is bound to dismiss the EC Complaint under the common-law doctrine known as the revenue rule. Defendants claim that this doctrine is an "international rule" that is "absolute," "categorical," and "jurisdictional." (Philip Morris's Mem. in Support of Mot. to Dismiss EC Compl. Under 12(b)(1) and (b)(7) at 33–34; May 1, 2001 Tr. at 151.) Plaintiff responds that the revenue rule has been repudiated. (Plfs.' Mem. in Opp. to Mot. to Dismiss Departments' Compl. Under 12(b)(1) and (b)(7) at 44.) In the alternative, Plaintiff contends that the rule is discretionary, and that its application is limited to actions brought by foreign sovereigns seeking to enforce tax judgments entered in foreign tribunals. (*Id.* at 52.) For the reasons set forth below, I conclude that whatever the collective impact of the many attacks leveled against the doctrine, its applicability in this case is doubtful; and that in light of recent Second Circuit decisions discussing the inapplicability of the revenue rule in the context of criminal prosecutions under the federal mail and wire fraud statutes, such doubt must be resolved against invoking the rule as a basis for declining jurisdiction over Plaintiff's civil RICO claims in the EC Case.

---

**12.** The arguments made in support of dismissing the EC and Amazonas Complaints on the basis of the revenue rule are substantially similar, and the memorandum in support of dismissing the EC Complaint under Fed. R.Civ.P. 12(b)(1) and (b)(7) incorporates by reference "relevant portions" of the memorandum in support of dismissing the Amazonas Complaint. (Defs.' Mem in Support of Mot. to Dismiss EC Compl. Under 12(b)(1) and (b)(7) at 26 n. 13.)

### 1. What is the Revenue Rule?—Comparison to Related Doctrines

■ Under the common law revenue rule, courts in this country "customarily refuse" to enforce the revenue laws of foreign sovereigns. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 448, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (White, J., dissenting). In often-cited *dicta,* Judge Learned Hand explained the policy considerations supposedly underlying the rule, which include separation of powers concerns and judicial hesitancy in the face of adjudicating claims presenting issues of foreign public law:

> While the origin of the [rule that a foreign state will not enforce the penal laws of another state] does not appear in the books, a sound basis for it exists, in my judgment, which includes liabilities for taxes ·as well .... To pass upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court; it involves the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities. It may commit the domestic state to a position that would seriously embarrass its neighbor. Revenue laws fall within the same reasoning; they affect a state in matters as vital to its existence as its criminal laws.

*Moore v. Mitchell,* 30 F.2d 600, 604 (2d Cir.1929) (Hand, J., concurring), *aff'd,* 281 U.S. 18, 50 S.Ct. 175, 74 L.Ed. 673 (1930); *see also U.S. v. Trapilo,* 130 F.3d 547, 550 (2d Cir.1997) ("[T]he rationale for [the revenue rule] is that issues of foreign relations are assigned to, and better handled by, the legislative and executive branches of the government."), *cert. denied,* 525 U.S. 812, 119 S.Ct. 45, 142 L.Ed.2d 35 (1998); *City of Phila. v. Cohen,* 11 N.Y.2d 401, 406, 230 N.Y.S.2d 188, 184 N.E.2d 167 (1962)

(noting comity concerns and concluding that to act as "collectors of taxes for another State ... would be an intrusion into the public affairs of another State"); *Her Majesty the Queen v. Gilbertson,* 433 F.Supp. 410, 412 (D.Or.1977) ("Selectively refusing to enforce a specific tax suit for reasons of public policy might well be taken as an affront to the taxing foreign government ... [which] could put the United States in an embarrassing position and upset the sometimes delicate relationship between the United States and other nations."), *aff'd,* 597 F.2d 1161 (9th Cir.1979).

Separation of powers and the traditional reluctance of U.S. courts to adjudicate claims presenting questions of foreign law whose resolution would implicate foreign policy concerns justify other common law doctrines as well, including the act of state, international comity and political question doctrines. My conclusion concerning the proper scope and application of the revenue rule is informed by the role played by the separation of powers doctrine in courts' and commentators' analysis of these related jurisprudential doctrines.

### (a) Act of State

■ The Supreme Court provided the classic formulation of the act of state doctrine more than 100 years ago:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897); *cf. Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812)

(Marshall, J.) ("The jurisdiction of the nation within its territory is necessarily exclusive and absolute .... Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty ...."). "The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory." *Sabbatino*, 376 U.S. at 401, 84 S.Ct. 923. The Second Circuit has noted that the act of state doctrine " 'is not jurisdictional.' " *Bigio v. Coca–Cola Co.*, 239 F.3d 440, 451 (2d Cir.2000) (quoting *Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 520 (2d Cir.1985)). Rather, the doctrine states a " 'principle of decision binding on federal and state courts alike.' " *W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp., Int'l*, 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (quoting *Sabbatino*, 376 U.S. at 427, 84 S.Ct. 923). Under the act of state doctrine, " 'the act within its own boundaries of one sovereign State ... becomes ... a rule of decision for the courts of this country.' " *Id.* (quoting *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 310, 38 S.Ct. 312, 62 L.Ed. 733 (1918)). Finally, "[a]ct of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign. When that question is not in the case, neither is the act of state doctrine." *Id.* (emphasis in original). In order to avoid overstepping the limitations imposed upon the judiciary in matters of foreign relations, application of the act of state doctrine entails, of necessity, an assessment of whether or not "the relief sought or the defense interposed would ... require[ ] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory."[13] *Id.* at 405, 84 S.Ct. 923.

As with the revenue rule, the policy rationale underlying the act of state doctrine emerges from the traditional concern of U.S. courts to ensure an adequate separation of powers between itself and its coordinate political branches in matters touching upon foreign affairs. *Id.* at 404, 84 S.Ct. 923 (noting that act of state doctrine is "a consequence of domestic separation of powers"). The doctrine "embodies the purely prudential concern that judicial inquiry into the validity of a foreign nation's sovereign acts may interfere with Executive and Congressional policy efforts." *Roe v. Unocal Corp.*, 70 F.Supp.2d 1073, 1076 (C.D.Cal.1999); *see also First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 765, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (holding the act of state doctrine justified "primarily on the basis that juridical review of acts of state of a foreign power could embarrass the conduct of foreign relations by the political branches of the government"); *Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 224 (2d Cir.1985) ("[T]he policy concerns underlying the doctrine require that the political branches be preeminent in the realm of foreign relations.").

---

**13.** The act of state doctrine does not, however, completely deprive the courts of jurisdiction to examine the validity of a foreign state's acts. The Supreme Court has noted that "sometimes, even though the validity of the act of a foreign sovereign within its own territory is called into question, the policies underlying the act of state doctrine may not justify its application." *W.S. Kirkpatrick & Co.*, 493 U.S. at 409, 110 S.Ct. 701. Absent such extraordinary circumstances, however, courts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them, *id.*, even when the outcome of the case turns upon the effect of a foreign sovereign's acts taken within its own territory.

### (b) International Comity

Justice Gray gave the doctrine of comity its classic formulation in *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895):

> 'Comity,' in the legal sense, is neither a matter of absolute obligation ... nor of mere courtesy and good will ... But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard to both international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.[14]

*Hilton,* 159 U.S. at 163–64, 16 S.Ct. 139. "Comity protects decisions of a foreign sovereign that cannot be completed within the sovereign's realm. In such cases, a foreign sovereign will request the assistance of United States courts, which is forthcoming absent some infringement upon United States public policy." Hon. Marianne D. Short & Charles H. Brower, *The Taming of the Shrew: May the Act of State Doctrine and Foreign Sovereign Immunity Eat and Drink as Friends?,* 20 Hamline L.Rev. 723, 725 (1997) (citing cases).

■ As is also true regarding the revenue rule and the act of state doctrine, separation of powers concerns inform application of the doctrine of international comity: "comity in the international context (in conjunction with separation of powers principles) requires deference to international and executive branch processes and efforts to establish coherent policies on matters of substantial public concern." *767 Third Ave. Assocs. v. Con-sulate Gen.,* 60 F.Supp.2d 267, 280 (S.D.N.Y.1999), *aff'd in part and vacated in part,* 218 F.3d 152 (2d Cir.2000). Thus, U.S. courts "ordinarily refuse to review. acts of foreign governments and defer to proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States." *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru,* 109 F.3d 850, 854 (2d Cir.1997). Comity "is best understood as a guide where the issues to be resolved are entangled in international relations." *In re Maxwell Communication Corp.,* 93 F.3d 1036, 1047 (2d Cir.1996).

■ International comity does not describe a limitation upon the subject matter jurisdiction of the federal courts. The Second Circuit has explained that "[w]hen a court dismisses a complaint in favor of a foreign forum pursuant to the doctrine of international comity, it declines to exercise jurisdiction it admittedly has." *Bigio,* 239 F.3d at 454 (citing cases).

### (c) Political Question

The Supreme Court set forth the well-known analysis for determining whether or not an issue is non-justiciable under the political question doctrine in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962):

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an

---

14. According to the Court's formulation of the principle in *Hilton,* comity describes the broader principle to which the revenue rule arguably provides an exception. In other words, absent the revenue rule, the effect to be given by a U.S. court to a foreign tax judgment or another sovereign's tax legislation would be decided according to principles of comity.

initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question. *Baker,* 369 U.S. at 217, 82 S.Ct. 691. Although the relative weight and usefulness of these criteria have been the subject of debate,[15] it is clear that most, if not all, reflect a concern to minimize the intrusion of the judiciary into those areas, including foreign affairs, traditionally held to be the exclusive concern of the political branches of government.

As with the doctrine of comity, the political question doctrine counsels caution in the face of adjudications whose international relations implications are pronounced. *See Baker,* 369 U.S. at 211–12, 82 S.Ct. 691 ("Our cases in [the field of foreign relations] seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action."). And like the act of state doctrine, the political question doctrine "is a function of the constitutional framework of the separation of powers." *767 Third Ave. Assocs. v. Consulate Gen. of Socialist Fed. Republic of Yugoslavia,* 218 F.3d 152, 164 (2d Cir.2000); *see also Kadic v. Karadzic,* 70 F.3d 232, 248 (2d Cir.1995) (noting that the political question and act of state doctrines "reflect the judiciary's concerns regarding separation of powers").

Applying the *Baker* factors, the Second Circuit in *767 Third Avenue Associates* concluded that the exercise of jurisdiction in that case was inappropriate on the grounds that "[a] determination by this court of the allocation of debt among the successor[ states to the former Socialist Federal Republic of Yugoslavia] might hinder or prejudice the future resolution of this issue through negotiations or another determination by the Executive [branch of the U.S. Government]," and because "[s]uch an outcome would directly 'interfere with executive foreign policy prerogatives.'" *767 Third Ave. Assocs.,* 218 F.3d at 160 (quoting *Can v. United States,* 14 F.3d 160, 163 (2d Cir.1994)). In conclusion, the court noted the constitutional underpinnings of the political question doctrine: "Just as 'Congress may not confer jurisdiction on Art. III federal courts to render advisory opinions, or to entertain friendly suits,' it may not require courts 'to resolve political questions,' because suits of this character are inconsistent with the judicial function under Art. III." *Id.* at 164 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 732 n. 3, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)).

This brief excursus illustrates the uncontroversial conclusion that the policies underlying the revenue rule also inform the act of state, international comity and political question doctrines. These doctrines, together with the revenue rule, provide the federal courts with tools for assessing, under varying circumstances, whether or not the exercise of jurisdiction is proper in a case presenting a question of foreign law. Under none of these doctrines is the exercise of jurisdiction improper in the absence of an issue whose adjudication would likely result in improper judicial encroachment upon the foreign

---

**15.** *See, e.g.,* Erwin Chemerinsky, *Federal Jurisdiction* § 2.6.1 (3d ed. 1999) ("[T]hese criteria seem useless in identifying what constitutes a political question.").

relations power committed to the coordinate political branches.

As discussed *infra*, the rule of decision in this case is provided by U.S. federal and state law. Although questions of foreign law are likely to arise during the course of this litigation (should it proceed beyond the motion to dismiss stage), these questions are ancillary to the domestic causes of action giving rise to liability. Nor is it at all likely that the resolution of foreign law issues in this case would offend the interests of the coordinate, political branches of government. The act of state doctrine does not apply, because liability does not turn on this court's interpretation of the effect of a foreign sovereign's official act; international comity is not at issue because there is no need for this court to defer to the legislative or judicial acts of a foreign sovereign; and the political question doctrine is not implicated because the principal questions presented for decision in these cases, namely whether or not Plaintiff can demonstrate liability under federal and state law causes of action, are quintessentially the province of the judiciary to decide.

Although liability does not turn upon the resolution of any question of foreign law, and notwithstanding the fact that no separation of powers concerns are meaningfully implicated, Defendants nonetheless maintain that the revenue rule, which is justified primarily on separation of powers grounds, presents an insuperable bar to the exercise of subject matter jurisdiction in these cases. This argument lacks merit. To side with Defendants on this issue would be contrary to Second Circuit precedent and would endow the revenue rule with much greater force than any other common law doctrine based on similar policies. Such policies do not constitute "a doctrine unto themselves." *W.S. Kirkpatrick & Co.*, 493 U.S. at 409, 110 S.Ct. 701.

In the absence of circumstances justifying its application, invocation of the revenue rule as a bar to jurisdiction in this case would amount to nothing more than an unwarranted "expan[sion of] judicial incapacities." *Id.*

## 2. The Revenue Rule Is Discretionary

■ The revenue rule is discretionary rather than jurisdictional. "Jurisdiction is the power to declare the law." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868). The common law doctrine affording this court discretion to decline enforcement of foreign tax judgments is a function of, rather than an exception to, its constitutional authority to adjudicate cases and controversies arising under the Constitution and laws of the United States. The policy concerns that give rise to and justify the revenue rule do not warrant elevating the doctrine to a categorical limitation upon the powers conferred upon the federal courts by the Constitution. Neither does any authoritative articulation of the rule suggest such a limitation: "a court *need not* give effect to the penal or revenue laws of foreign countries." *Sabbatino*, 376 U.S. at 413–14, 84 S.Ct. 923 (emphasis added); *accord Trapilo*, 130 F.3d at 550 ("our courts will *normally not* enforce foreign tax judgments") (emphasis added); *United States v. Boots*, 80 F.3d 580, 587 (1996) ("our courts have traditionally been *reluctant* to enforce foreign revenue laws") (emphasis added); Restatement (Third) of Foreign Relations Law § 483 (1987) ("Courts in the United States are *not required* to recognize or to enforce judgments for the collection of taxes, fines, or penalties rendered by the courts of other states.") (emphasis added).

The clearest indication that the rule is not jurisdictional is the Supreme Court's statement to this effect in *Milwaukee*

*County v. M.E. White Co.*, 296 U.S. 268, 56 S.Ct. 229, 80 L.Ed. 220 (1935). There the Court observed, on its way to concluding that the Full Faith and Credit clause requires federal district courts in one state to recognize tax judgments rendered by the courts of another state, that the revenue rule imposes no limitation upon the jurisdiction of the federal courts:

> The objection that the courts in one state will not entertain a suit to recover taxes due to another or upon a judgment for such taxes is not rightly addressed to any want of judicial power in courts which are authorized to entertain civil suits at law. It goes not to jurisdiction, but to the merits, and raises a question which District Courts are competent to decide.

*Milwaukee County*, 296 U.S. at 272, 56 S.Ct. 229 (citations omitted). It is thus clear to me that the revenue rule does not deprive this court of the power, as a constitutional matter, to adjudicate cases and controversies properly before it simply because to do so may implicate a foreign tax law.

Instead, the revenue rule is in the nature of a doctrine of abstention. Like the related doctrines discussed *supra*, it describes juridical principles which indicate when it may be appropriate for a court to decline to exercise its jurisdiction. *See Bigio*, 239 F.3d at 451 ("Even when a district court has jurisdiction over a case, it may choose not to exercise that jurisdiction if principles of abstention are applicable."). Thus, in order for the revenue rule to serve in any sense as a bar to a lawsuit, it can only be where, in accordance with the doctrine, a court has recognized "an exception to a [court's] normal duty to adjudicate a controversy properly before it." *Hachamovitch v. DeBuono*, 159 F.3d 687, 693 (2d Cir.1998) (citation omitted). As when courts undertake analyses pursu-

ant to the other, related jurisprudential doctrines, discretion under the revenue rule "must be exercised within the narrow and specific limits prescribed by the particular abstention doctrine involved." *Id.* (citation omitted). A decision in this or any other case to abstain pursuant to the revenue rule would therefore constitute an exception to the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

### 3. Historical Origins of the Revenue Rule

The revenue rule provides no basis for abstention in this case. As discussed *infra*, abstention under the revenue rule is never warranted in the absence of genuine separation of powers concerns. A review of the early revenue rule cases, and of the cases in which something approaching a contemporary rationale for the rule is set forth, demonstrates that separation of powers is the only remaining legitimate basis for invoking the doctrine. None of the ancient rationales retain sufficient force, in the absence of a real threat of judicial encroachment upon the authority of the political branches, to justify an exception to the otherwise "unflagging obligation" of the federal courts to exercise jurisdiction to adjudicate properly presented cases. This is especially true, as discussed *infra*, with respect to cases arising under U.S. law.

The common law ancestry of the revenue rule extends back more than two centuries. The fact that the rule has been invoked continuously since well before the American Revolution does not, however, guarantee its continued applicability. There is little reason to expect that courts today would see fit to invoke the rule, as

did British courts in the eighteenth century, without greater justification than was stated in the early cases. *See* Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L.Rev. 457, 469 (1897) ("It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitations of the past."). Courts' understanding of the policy bases for the rule has been greatly refined since its inception; the Second Circuit, in particular, has all but eliminated at least one major rationale for reliance upon the rule.

The origin of the revenue rule is nearly always traced to Lord Mansfield's often-repeated and conclusory dictum in *Holman v. Johnson*, 1 Cowp. 341, 98 Eng. Rep. 1120 (K.B.1775), that "no country ever takes notice of the revenue laws of another." The first case applying the rule that "one state will not enforce the revenue measures of another" is attributed not to Lord Mansfield, however, but to Lord Hardwicke in *Boucher v. Lawson*, 1734, Cases Temp. Hardwicke 85, 95 Eng. Reprint 53. *Boucher* was a case brought against the master of a vessel transporting gold from Portugal to England, who refused to deliver the cargo to the plaintiff upon the ship's arrival in London. The defendant argued that no remedy was available because the underlying contract was illegal under the law of Portugal. Lord Hardwicke rejected the defense on the ground that to recognize it would "cut off all benefit of such trade from this kingdom, which would be of very bad consequence to the principal and most beneficial branches of our trade."

The famous *Holman* case, decided over forty years later, was brought by a French seller against his English purchaser who withheld payment on a shipment of tea. The English purchaser argued that the contract was illegal because it had been made for the purpose of smuggling the goods into England without paying English duties. Noting that even though "[t]here are a great many cases which every country says shall be determined by the laws of foreign countries where they arise," Lord Mansfield declined to apply the choice of law principle that "with regard to contracts legally made abroad, the laws of the country where the cause of action arose shall govern," on the grounds that "no country ever takes notice of the revenue laws of another." *Holman*, 98 Eng. Rep. at 1121. Lord Mansfield essentially amended the traditional conflicts of law rule to include an exception pertaining only to contract cases in which the agreement at issue was (1) made abroad, and (2) reached with the purpose of violating British revenue laws.

Lord Mansfield also decided *Planche v. Fletcher* (1779) 1 Doug. K.B. 251. In *Planche*, an insurer of cargo had declined coverage on the ground that the policy, which specified travel from London to Ostend, Belgium, and from there to Nantz, France, was unenforceable because the ship had actually traveled directly to Nantz. The insurer claimed that the cargo's origin had been fraudulently indicated as Ostend in order to avoid higher French duties on English goods. Lord Mansfield concluded that no fraud had been committed, because "[w]hat had been practiced in this case was proved to be the constant course of trade, and notoriously so to every body." Ruling against the insurer, he added, "[b]ut, at any rate, this was no fraud in this country. One nation does not take notice of the revenue laws of another." The justification for referring to the revenue rule seems even weaker in *Planche* than in *Holman*, not least of all because the enforceability of the insurance

contract did not turn on a question of foreign law. On balance, the decision says more about the willingness of the court to countenance what appears to have been an accepted practice in the shipping industry than it does concerning the policy basis for the revenue rule.

These early British cases, long considered the *fons et origo* of the revenue rule, provide little explicit justification for the rule's emergence. Courts have noted, moreover, the tenuous connection between the context in which the rule was first articulated and the uses to which it has since been put in modern cases:

> [i]n none of the[se early cases] was an attempt made to collect a tax due to a foreign state, but in each case the question presented was whether a contract made to evade a foreign revenue law or which did not comply with the revenue laws of the locus contractus was enforceable in England; and, *in each case, the ruling was based upon a desire to promote commercial convenience.*

*State ex rel. Okla. Tax Comm'n,* 238 Mo. App. 1115, 193 S.W.2d 919, 922 (1946) (emphasis added) (upholding a suit by Oklahoma for income tax incurred by former Oklahoma residents and concluding that there is "no valid justification for not permitting a suit in this state for a tax lawfully levied by another"); *see also Buckley v. Huston,* 60 N.J. 472, 474, 291 A.2d 129, 130 (N.J.1972) (holding that the taxing authority of the City of Philadelphia had a common law right to proceed in the courts of New Jersey to recover wage taxes due to Philadelphia and noting that "[t]he English cases which gave rise to the early American common law notion that one state would not enforce the revenue laws of another, arose in international commercial contexts which have no relation whatever to the context at hand"). In none of the early British cases, moreover, did the rev-

enue rule provide the basis of decision. *See, e.g.,* Kovatch, *Recognizing Foreign Tax Judgments,* 22 Hous. J. Int'l L. 265, 273–78 (2000).

### 4. The Rationales Underlying the Revenue Rule Have Been Called Into Doubt

The early cases provide insufficient justification to support the revenue rule, and no court today could rely upon these decisions, without more, as sufficient justification for withholding jurisdiction. Modern courts have sought to place the rule on a more secure footing. Even modern justifications, however, have been strongly resisted. *See, e.g., Trapilo,* 130 F.3d at 550 n. 4 (2d Cir.1997); *see also generally* Barbara A. Silver, *Modernizing the Revenue Rule; The Enforcement of Foreign Tax Judgments,* 22 Ga. J. Int'l & Comp. L. 609 (1992); Kovatch, *supra.*

Such criticism is hardly new. Justice Story first expressed doubts concerning the soundness of the revenue rule in *The Anne,* 1 F. Cas. 955, 1 Mason 508, No. 412 (C.C.D.Mass.1818), a maritime case brought in federal district court to recover for pilotage services. Observing that the facts of the case strongly suggested that the ship's passengers and crew, originally destined for Quebec, then a British colony, had staged a mutiny and hired a local pilot in order to evade British laws restricting the number of passengers on board a ship destined for the United States, Justice Story criticized, in passing, the policy basis for the refusal of courts to enforce foreign municipal regulations:

> I confess that I have always been a good deal staggered by this doctrine. It has appeared to me more consonant with national comity, sound morals, and public justice, that courts of all countries should lend their aid to discountenance frauds upon the revenue laws of other countries, and decline to enforce any

**480**

agreements entered into for the purpose of evading those laws. An exception might very properly apply, where those laws were in direct hostility to our own policy or laws, or were inconsistent with the principles of general justice. But the rule is now too stubborn to be controlled . . . .

*Id.* at 956.

Justice Story's criticism anticipated by more than a century broader attacks leveled by numerous jurists upon the legitimacy of the revenue rule. Modern attacks proceed against every rationale traditionally thought to support the doctrine. For example, the revenue rule has been justified on the grounds that revenue laws, like penal laws, are "provisions for the public order," and that to pass on such provisions "should be, beyond the powers of a court; it involves the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities." *Moore,* 30 F.2d at 604 (2d Cir.1929) (Hand, J., concurring). Several years later, however, the Supreme Court took a different view, stating that "the obligation to pay taxes is not penal. It is a statutory liability, quasi contractual in nature, enforceable, if there is no exclusive statutory remedy, in the civil courts . . ." *Milwaukee County,* 296 U.S. at 271, 56 S.Ct. 229; *see also City of Phila. v. Cohen,* 15 A.D.2d 464, 222 N.Y.S.2d 226, 228 (N.Y.App.Div.1961) ("[T]ax laws and penal laws are not the same and considerations valid against enforcing the one are pointless as against the other."), *aff'd,* 11 N.Y.2d 1077, 230 N.Y.S.2d 226, 184 N.E.2d 194 (1962). Guided by the Supreme Court's unequivocal dissociation of penal and revenue laws in *Milwaukee County,* this court must regard foreign revenue laws in the same light as foreign civil judgments and non-penal enactments, which U.S. courts routinely enforce regardless of whether the propounding court is domestic or foreign.

Apart from the discredited analogy of revenue enactments to penal laws, courts have found support for the revenue rule in the traditional deference that federal courts accord to the political branches in matters of foreign policy. *See, e.g., Trapilo,* 130 F.3d at 550. As discussed, *supra,* however, the federal courts are hardly under an obligation to decline jurisdiction in the face of every decision implicating foreign affairs concerns, and "it is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. 691. Proponents of the revenue rule have come under criticism for advocating a heavy-handed approach where a more sensitive analysis is warranted. For example, whereas defenders of the revenue rule contend that enforcement of foreign tax judgments will cause embarrassment to foreign sovereigns, opponents argue that the judiciary is unlikely to cause offense to a foreign sovereign that has availed itself of this country's courts. The Missouri Court of Appeals criticized the rule on this ground in *Oklahoma Tax Commission,* in which the court commented as follows on Judge Hand's *dictum* in *Moore:*

> We fail to see that this is a valid objection to accepting jurisdiction in such cases. The foreign state would not be likely to object or to be offended over such procedure because it is the one seeking relief and is asking the court to scrutinize those relations.

*Okla. Tax Comm'n,* 193 S.W.2d at 924; *see also* Note, 77 Harv. L.Rev. 1327, 1328 (1964) ("[The argument against enforcing foreign revenue laws based on the fear of embarrassing foreign sovereigns] is not seriously offered when the foreign government sues in its own name to enforce a

contract to which it is a party despite the possibility that the forum government will not recognize the claim for reasons of public policy.").

Courts in this and other countries are accustomed to entertaining public policy challenges to the enforcement of foreign judgments, despite the potential for embarrassment to the foreign nation. *See* Kovatch, *supra,* at 279 (noting the codification of the public policy exception to the enforcement of foreign judgments in international conventions); *see also Ackermann v. Levine,* 788 F.2d 830, 841 (2d Cir.1986) ("A judgment is unenforceable as against public policy to the extent that it is repugnant to fundamental notions of what is decent and just in the state where enforcement is sought.") (internal quotation marks and citation omitted); *Matusevitch v. Telnikoff,* 877 F.Supp. 1 (D.D.C.1995) (declining to recognize a British libel judgment as repugnant to the public policies of Maryland and the United States). There seems scant basis for assuming that tax enactments implicate sovereign dignity more thoroughly than other categories of legal enactment.

Courts and commentators have criticized the revenue rule on the ground that the impediments to efficient claim resolution—in the form of parochial, disparate economies and technological impediments—have been largely eradicated by the emergence of globally interdependent economies and technological advances. *See, e.g., Trapilo,* 130 F.3d at 550, n. 4 ("In an age when virtually all states impose and collect taxes and when instantaneous transfer of assets can be easily arranged, the rationale for not recognizing or enforcing tax judgments is largely obsolete.") (quoting Restatement § 483); *Banco Frances e Brasileiro v. Doe,* 36 N.Y.2d 592, 370 N.Y.S.2d 534, 538, 331 N.E.2d 502 (*"Nor is the [revenue] rule analytically justifiable.* Indeed, much

doubt has been expressed that the reasons advanced for the rule, if ever valid, remain so. But inroads have been made .... Some do consider that, in light of the economic interdependence of all nations, the courts should be receptive even to extranational tax and revenue claims ....") (emphasis added and citation omitted), *cert. denied,* 423 U.S. 867, 96 S.Ct. 129, 46 L.Ed.2d 96 (1975).

Related to this view is the concern that rigid enforcement of the revenue rule, so far from promoting any positive value, will have the effect of attracting tax evaders to the United States. *See* Note, 77 Harv. L.Rev. 1327, 1330 (1964) (describing *United States v. Harden,* 41 D.L.R.2d 721 (Can. 1963) (commenting that the rule "increas[es the] possibility that foreign jurisdictions will become havens for tax evaders")).

Thus, although the rule is arguably the law of this circuit, *see United States v. First Nat'l City Bank,* 321 F.2d 14, 23–24 (2d Cir.1963), *rev'd on other grounds,* 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); *Moore,* 30 F.2d at 602; *see also Trapilo,* 130 F.3d at 552–53, its continuing vitality is seriously in doubt, as discussed *infra. See Att'y Gen. of Canada v. RJ Reynolds Tobacco Holdings, Inc.,* 103 F.Supp.2d 134, 140 n. 3 (N.D.N.Y.2000) ("Were the Court writing on a clean slate ... it would be inclined to find the Revenue Rule to be outdated (to the extent it was ever properly recognized by courts in the United States in the first instance) and the rationales for the rule to be largely unpersuasive, at least with respect to the recognition of foreign tax judgments."). Even more doubtful is the application of the rule to the facts of this case, in which Plaintiff does not seek enforcement of a foreign tax judgment, and in which the rule of decision is provided by domestic law.

### 5. The Second Circuit Does Not Categorically Apply the Revenue Rule

In a pair of recent cases—*United States v. Trapilo,* 130 F.3d 547 (2d Cir.1997), and *United States v. Pierce,* 224 F.3d 158 (2d Cir.2000)—the Second Circuit has indicated that the revenue rule should not be applied categorically. In *Trapilo,* the court rejected the trial court's dismissal of a prosecution under the federal wire fraud statute. The court in *Trapilo* held that a scheme to defraud the Canadian government of tax revenue is cognizable under 18 U.S.C. § 1343, reversed the order of the district court dismissing the indictment alleging a money-laundering conspiracy in violation of 18 U.S.C. § 1956, and remanded the case to the district court for further proceedings. The Court of Appeals emphasized that "[t]he [wire fraud] statute neither expressly, nor impliedly, precludes the prosecution of a scheme to defraud a foreign government of tax revenue, and the common law revenue rule, inapplicable to the instant case, provides no justification for departing from the plain meaning of the statute." *Trapilo,* 130 F.3d at 551. The court reasoned that, "[u]nder both the mail fraud and wire fraud statutes, '[t]he thing which is condemned is (1) the forming of the scheme to defraud, however and in whatever form it may take, and (2) a use of [mail and wire communications] in its furtherance. If that is satisfied, more is not required.'" *Id.* (quoting *Gregory v. United States,* 253 F.2d 104, 109 (5th Cir. 1958)).

The court in *Trapilo* expressly rejected the conclusion reached by the First Circuit in *United States v. Boots,* 80 F.3d 580 (1st Cir.1996), and relied upon by the lower court, that the revenue rule precluded application of the federal wire fraud statute in criminal prosecutions of alleged schemes to defraud foreign governments of tax revenue. *Id.* at 549, 551. In *Boots,* the First Circuit, after admitting that resolution of the case did not require enforcement of "a foreign tax judgment as such," the First Circuit nevertheless concluded that, "[t]o convict ... the district court and this court must determine whether a violation of Canadian tax laws was intended and, to the extent implemented, occurred. In so ruling, our courts would have to pass on defendants' challenges to such laws and any claims not to have violated or intended to violate them." *Boots,* 80 F.3d at 587. The First Circuit concluded that the revenue rule thus precluded the exercise of jurisdiction because "[w]here a domestic court is effectively passing on the validity and operation of the revenue laws of a foreign country, the important concerns underlying the revenue rule are implicated." *Id.* The Second Circuit flatly disagreed with this conclusion: "[t]he intent to defraud does not hinge on whether or not the appellees were successful in violating Canadian revenue law ... [and c]onsequently, there is no obligation to pass on the validity of Canadian revenue law." *Trapilo,* 130 F.3d at 552–53.

The First and Second Circuits do not appear to disagree that criminal prosecutions such as those at issue in *Boots* and *Trapilo* in some sense implicate foreign revenue laws. Clearly, the prosecutions in *Trapilo* and *Pierce* require, at a minimum, that the government introduce evidence of the existence of Canadian revenue law (and also, *a fortiori,* that the court would be required to take cognizance of that law):

> we assumed in *Trapilo* that the government would be able to prove what the indictment alleged .... One element of the crime ... was that [Defendants] conspired to promote, or use the profits, of a scheme to defraud the Canadian government of tax or duty. In the ab-

sence of any proof of such tax or duty, there was no such scheme to defraud. *Pierce*, 224 F.3d at 167–68. Rather, the First and Second Circuits differ concerning the consequences, in a criminal prosecution under the federal wire fraud statute, of introducing proof of foreign tax laws into evidence. The *Trapilo* decision makes this clear. Unlike the *Boots* court, the court in *Trapilo* rejected the notion that the revenue rule mandates categorically that U.S. courts refrain from exercising jurisdiction over all cases requiring application of Canada's tax laws. Instead, the court in *Trapilo* considered whether or not the application of Canada's tax laws in the case before it would give rise to separation of powers concerns traditionally thought to warrant abstention under the revenue rule. Focusing on the statutory requirements for prosecution under the particular statute at issue, the court concluded:

> The simple fact that the scheme to defraud involves a foreign sovereign's revenue laws does not draw our inquiry into forbidden waters reserved exclusively to the legislative and the executive branches of our government. We concern ourselves only with what has been expressly forbidden by statute—the use of the wires in the scheme to defraud. Whether our decision today indirectly assists our Canadian neighbors in keeping smugglers at bay or assists them in the collection of taxes, is not our Court's concern. Therefore, the presence or absence of reciprocal smuggling laws is irrelevant. Our goal is simply to vindicate the intended purpose of the statute, that is, to prevent the use of [our telecommunication systems] in furtherance of fraudulent enterprises.

*Trapilo* 130 F.3d at 553.

 It thus could not be more clear that in the Second Circuit, at any rate, the revenue rule does not automatically compel judicial abstention in deference to the coordinate political branches every time a foreign revenue law is in any way implicated in the adjudication of an otherwise properly presented case or controversy arising under U.S. law. This conclusion is demonstrated, for example, by the Second Circuit's insistence in *Pierce* that the prosecution at issue in that case could not go forward "without evidence that Canada imposes duty on imported liquor in the first place." *Pierce*, 224 F.3d at 166. In the absence of such evidence, the Second Circuit concluded, "the Pierces were no more guilty of wire fraud than they would have been had they used the wires in furtherance of a scheme surreptitiously to transport liquor down the Hudson River from Yonkers into New York City, by flat-bottomed boat in the dead of night, in the sincere but mistaken belief that New York City imposes a duty on such cross-border shipments." *Id.* The introduction of such evidence by the prosecution presumably would have opened the door to some form of challenge to the legitimacy of Canada's revenue laws. This possibility did not, however, suffice in *Pierce* to warrant abstention under the revenue rule. The conclusion that the rule is not categorically applied in this circuit is thus unavoidable.

### 6. Revenue Rule Not Implicated in the EC and Amazonas Cases

 In light of the *Trapilo* and *Pierce* decisions, I must decide whether assessing damages under civil RICO and the state common law causes of action is likely to "involve[ ] a foreign sovereign's revenue laws" to such a degree that the inquiry is drawn into "forbidden waters." *Trapilo*, 130 F.3d at 553. According to the Supreme Court, my inquiry into "the Constitution's central mechanism of separation of powers depends largely upon common un-

derstanding of what activities are appropriate to legislatures, to executives, and to courts." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). For the following reasons, I conclude that the likelihood in this case of being drawn into "forbidden waters" is, at best, remote.

The gravamen of the EC Complaint is that Defendants' schemes to smuggle cigarettes into the Member States' territories violated U.S. federal and state law and caused economic harm in the form of lost tax revenues. In the event that Plaintiff is successful in demonstrating liability under civil RICO and the state law causes of action, the measure of damages would be assessed, in part at least, with reference to the operation of foreign tax laws. As stated *supra*, I would then, at the damages phase of the trial, be required to take cognizance of and interpret the Member States' revenue laws.[16] But in no event would I be required to apply foreign law as the rule of decision, as I would in the "classic" case for application of the revenue rule, in which a foreign sovereign seeks to enforce a tax claim already reduced to judgment in that sovereign's own courts. *See, e.g., Gilbertson*, 433 F.Supp. 410. Nor am I called upon in the EC Case to hear a so-called "unadjudicated" tax claim, in which case also would I be required to apply a foreign revenue enact-

ment as the rule of decision. Because liability in the EC Case turns on the effect to be given U.S. federal and state law, I am not called upon to decide any matter traditionally or more appropriately entrusted to a coordinate branch of government.

This conclusion finds support in the *Trapilo* and *Pierce* decisions, which make clear that merely taking cognizance of foreign tax laws is not *per se* sufficient to preclude this court from exercising jurisdiction over Plaintiff's claims: "[t]he simple fact that the scheme to defraud involves a foreign sovereign's revenue laws does not draw our inquiry into forbidden waters reserved exclusively to the legislative and the executive branches of our government." *Trapilo*, 130 F.3d at 553.

As Defendants have pointed out on numerous occasions both in their briefs and at oral argument, the district court in *Attorney General of Canada* concluded that the revenue rule precluded it from permitting the plaintiff in that case to prove liability under civil RICO. To do so, the court noted, would require Canada to prove, and it to pass on "the validity of the Canadian revenue laws and their applicability hereto and the Court would be, in essence, enforcing Canadian revenue laws." *Att'y Gen. of Canada*, 103 F.Supp.2d at 143. But as the Second Circuit stated in *Trapilo*, "[w]hether our deci-

---

**16.** At oral argument on May 25, 2001 counsel for the Philip Morris Defendants expressed, in the following words, his fear that a trial in this case would present insurmountable difficulties due to the necessity of interpreting foreign tax laws:

> [A]s hard as it was for the Court, and the Court obviously has been extremely conscientious, tried very hard, listened very carefully, asked very probing questions, and is clearly trying to understand the legal systems in fifteen member states, the E.C., the Republic of Colombia and the Departments. Think about what a jury is going to be like

> [hearing] a case [and attempting] to analyze the tax laws of these multiple jurisdictions, with all kinds of arcana, totally foreign to us.

(May 25, 2001 Tr. at 528.) Although I agree with counsel that the interpretation of foreign law poses a significant challenge, I am confident that this court is up to the task. Moreover, the jury would play no role in the interpretation of foreign tax statutes which, pursuant to Fed.R.Civ.P. 44.1, is an issue of law to be decided by the court. *See infra* n. 21.

sion today indirectly assists our Canadian neighbors in keeping smugglers at bay or assists them in the collections of taxes, in not our Court's concern." *Trapilo,* 130 F.3d at 553. The court's emphasis is clear: the object of the prosecution in that case was to vindicate the interest of the United States by punishing the use of the wires in the scheme to defraud Canada of its money or property. By exercising its jurisdiction over such a prosecution, the court assumed its instrumental role in effectuating the will of Congress as expressed in the civil RICO statute. As in *Pierce,* the fact that Plaintiff's recovery here, should they succeed in demonstrating liability, will be measured in terms of lost tax revenue does not amount to a usurpation of congressional authority. In fact, the opposite is true. The object of the civil RICO statute is to punish racketeering activity, whatever form it may take. If that end is realized, this court's exercise of its jurisdiction will have been in the service of a clearly expressed congressional objective. As in *Pierce,* the fact that some collateral benefit may accrue to the EC in its efforts to defeat smuggling and recoup lost tax revenues cannot serve as a basis for declining jurisdiction.

Defendants further contend that separation of powers concerns are implicated because the United States has entered into certain tax treaties with numerous EC Member States. In this respect, Defendants' arguments mirror the conclusion reached by the court in *Attorney General of Canada* that tax treaties concluded between the United States and Canada "strongly suggest[s] that Canada's RICO claim would draw the Courts inquiry into forbidden waters." *Att'y Gen. of Canada,* 103 F.Supp.2d at 143 (internal quotations omitted). I respectfully disagree with my colleague that the existence of tax treaties presents an obstacle to this court's exercise of jurisdiction over Plaintiff's civil RICO claims. None of the tax treaties brought to this court's attention prohibits Plaintiff from seeking redress for harms caused by racketeering. While it is undoubtedly true, as Defendants assert, that "[t]he limits placed on collection assistance in the[ ] various [tax] treaties [between the United States and EC Member States] reflect the considered policy judgment of the political branches," this does not warrant the conclusion that "adjudication of the EC's [civil RICO and common law] claims would unavoidably interfere with the conduct of foreign relations committed to the political branches." (RJR Mem. in Support of Mot. to Dismiss EC Compl. at 12–13.) There is no conflict between the language of the treaties and the EC's availing itself of a cause of action created by Congress. Likewise, adjudication of this case in no way involves the judiciary in second-guessing the adequacy, legitimacy, or propriety of any action taken or judgment made by Congress or the Executive Branch with respect to the ability of foreign sovereigns to enforce their tax laws. And it is simply inaccurate to argue that the vindication of harms suffered in violation of civil RICO amounts to the judicial creation of an alternative tax enforcement mechanism. Such an assertion ignores the fundamental difference between, on the one hand, Congress' creation of a cause of action with the express object of punishing racketeering activity, and, on the other hand, the foreign policy decision to delimit, on a country-by-country basis, the scope of international cooperation in matters of taxation. To the extent that the exercise of jurisdiction in this case promotes the former, and in no way impinges upon the latter, separation of powers concerns are not meaningfully implicated.

My conclusion would be different, of course, if Congress had indicated that civil RICO was not available when the effect of

the alleged racketeering is to deprive a foreign sovereign of tax revenues. In fact, Congress has been invited by the courts to enact precisely such a limitation upon the scope of the RICO statute. In *Illinois Department of Revenue v. Phillips*, 771 F.2d 312 (7th Cir.1985), the Court of Appeals for the Seventh Circuit reversed the district court's dismissal of a suit brought by the State Department of Revenue against a retailer who filed fraudulent state sales tax returns. The reluctance of the *Phillips* court to permit the suit could not have been more explicit: "*[a]lthough we have doubts about the application of RICO to the facts of this case* we cannot say that it does not come within the framework of the statute." *Phillips*, 771 F.2d at 317 (emphasis added). Nevertheless, the court could find no indication that Congress had intended to narrow the scope of RICO to preclude such claims, noting "[t]he [legislative] history ... is in fact silent on this point." *Id.* The court then explicitly invited Congress to take action, stating "[w]e can only hope that this decision appears to Congress as the distress flag that it is, and that Congress will act to limit, as only it is empowered to do, the statute's application to cases such as the one before us now." *Id.* In the more than fifteen years since the Seventh Circuit raised its "distress flag," Congress has done nothing to limit the ability of governmental entities to seek redress for harms suffered as a result of racketeering activity in violation of civil RICO, even where the effect of such activity is to deprive those entities of tax revenue.

This would also be an entirely different case if, for example, Plaintiff sought redress in this court for harms suffered as a result of another nation's violation of international law. In such a case, "the usual method [would be] to exhaust local remedies and then repair to the executive authorities of his own state to persuade them

to champion his claim in diplomacy or before an international tribunal." *Sabbatino*, 376 U.S. at 422–23, 84 S.Ct. 923. Here, by contrast, the EC seeks redress for harms suffered as a result of various private corporations' violations of U.S. federal and state law. Thus, neither international law nor the law of any foreign sovereign or treaty-based organization provides this court's rule of decision; liability cannot be assigned in this case except under U.S. law. In this respect, again, this case is indistinguishable from *Trapilo*. And, as in that case, the requirement that this court take notice of and interpret foreign revenue laws in order to ascertain the measure of damages to be awarded upon a finding of liability arising under U.S. law does not encroach upon the coordinate branches' conduct of foreign policy. Thus, in the absence of separation of powers concerns, the revenue rule is not implicated, and presents no bar to this court's exercise of subject matter jurisdiction to hear the above-captioned cases.

## VI. Standing Under 18 U.S.C.1964(c)

18 U.S.C. § 1964(c) confers standing upon "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter ..." Thus, in order to have standing to sue under civil RICO, a plaintiff must allege that (1) he is a "person," (2) he was injured in his business or property, (3) the defendant violated section 1962, and (4) the defendant's violation caused the plaintiff's injury. *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990). I address each of these elements in turn.

### A. Is the EC a "Person" Under 1964(c)?

As discussed above, RICO creates a private civil cause of action for "[a]ny person injured in his business or proper-

ty." 18 U.S.C. § 1964(c). Defendants argue, on various grounds, that Plaintiff is not a "person" within the meaning of § 1964(c). These arguments are unpersuasive.

Distilled to its essence, Defendants raise the question of whether or not a foreign government or foreign governmental entities may bring suit under 1964(c). This is an issue of statutory interpretation, and so I begin with the language of the statute itself. *See Lewis v. United States,* 445 U.S. 55, 60, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980).

RICO confers standing upon "persons." 18 U.S.C. § 1964(c). It is true, as Defendants assert, that the Supreme Court's decision *United States v. Cooper Corp.,* 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941), held that sovereigns are not included within the meaning of "person" as that term is used in the Sherman Act. *See Cooper,* 312 U.S. at 604–05, 61 S.Ct. 742. In *Cooper,* the Court found that "in common usage, the term 'person' does not include the sovereign," but covers instead "what are usually known as natural and artificial persons, that is, individuals and corporations." *Id.* at 606, 61 S.Ct. 742. The Supreme Court's construction of the Sherman Act in *Cooper* does not, however, apply to RICO Congress included in the RICO statute a definition of the term "person." The Sherman Act includes no such definition. The Court in *Cooper* was therefore constrained to interpret the term according to its common and ordinary meaning. In the RICO statute, by contrast, Congress has endowed the term with a much broader meaning. Under RICO, "person" means "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Therefore, unlike the *Cooper* Court, I must interpret the word "person" not in accordance with the generally accepted meaning, but in accordance with the definition given the term by Congress.

That the EC is capable of holding a "legal or beneficial interest in property" cannot seriously be doubted. All that remains, therefore, is to determine whether or not Plaintiff qualifies under the statute as an "entity." Used in legal contexts,[17] the term "entity" generally means "[a]n organization (such as a business or a governmental unit) that has a legal identity apart from its members." Black's Law Dictionary (7th ed.1999). The term encompasses the sub-definition "public entity," which is "[a] governmental entity, such as a state government or one of its political subdivisions." Black's Law Dictionary (7th ed.1999). Accordingly, I conclude that foreign governmental entities fall within the plain statutory meaning of the term "person" in § 1964(c).

Defendants' discussion of the legislative history does not persuade me to the contrary. An earlier version of RICO had no provision for civil remedies. *See* S. 1861, 91st Cong., 1st Sess., 115 Cong. Rec. 9951 (1969). Subsection (c) was added to § 1964, at least in part, so that "private persons injured by reason of a violation of the title may recover." 116 Cong. Rec.

---

**17.** The dictionary definition of the word "entity" is "being" or "existence." Webster's Coll. Dictionary (10th ed.1999). That definition is unhelpfully over-expansive, and so I assume Congress understood the term as used in legal contexts. *Cf. Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 222, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996) (rejecting the natural and ordinary meaning of "damage" when it would produce overbroad and nonsensical results); *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307–09, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961) (adopting a more technical interpretation of the word "discovery" because of its overbroad ordinary meaning). I note in passing, however, that this broad definition would naturally include foreign governmental entities.

35,295 (1970) (Rep.Poff); H.R.Rep. No. 1549, 91st Cong., 2d Sess. 57, *reprinted in* 1970 U.S.C.C.A.N. 4007, 4010 ("The title, as amended, also authorizes civil treble damage suits on the part of private parties who are injured."). Defendants argue that the legislative discussions of "private" parties evinces an intent to exclude public plaintiffs from bringing suit. I disagree. The mere iteration of the word "private" in the record carries little weight. First, Congress has explicitly excluded governmental units from otherwise expansive statutory definitions. *See, e.g.,* 11 U.S.C. § 101(41) (excluding governmental units from the definition of "person"). Congress could have made such an intention clear by placing the adjective "private" in the text of § 1964(c) or § 1961(3). *Cf. Gutierrez v. Ada,* 528 U.S. 250, 256, 120 S.Ct. 740, 145 L.Ed.2d 747 (2000) ("To argue otherwise is to tag Congress with an extravagant preference for the opaque when the use of a clear adjective or noun would have worked nicely."). Nevertheless, despite the use of the phrase "private persons" in the legislative history, Congress omitted the adjective and chose instead to enact the statute as written.

Second, the mention of the word "private" does not compel even the limited conclusion that individual *drafters* intended to restrict access to RICO's civil provisions to private individuals. The drafters of § 1964(c) may very well have had as their primary purpose to compensate private persons. Even so, there is no basis for concluding that Congress also intended this as the exclusive purpose; I hesitate to infer, in the absence of substantial support, that these references to specific examples, made in an attempt to adduce primary intent, necessarily relegate all secondary effects to the status of undesired consequences. Because the statute as enacted does not contain a textual basis for infer-

ring a "private" limitation, I must conclude that the above references to the congressional record indicate (if they indicate anything at all) Congress' primary, though not exclusive, purpose. Congress enacted the statute without the "private" qualifier. And although the phrase "private persons" may at the time of drafting have had its proponents, it would be entirely improper for me to hold such an inference to be controlling.

Finally, I note that many cases have interpreted the term "person" in RICO to include public sector entities. *See, e.g., Frooks v. Town of Cortlandt,* 997 F.Supp. 438, 457 (S.D.N.Y.1998) ("[A] municipality is undoubtedly a 'person' within the meaning of 18 U.S.C. § 1961(3) . . . ."); *Nu–Life Constr. Corp. v. Bd. of Educ. of the City of N.Y.,* 779 F.Supp. 248, 251 (E.D.N.Y.1991) (a city may be a RICO defendant); *County of Oakland v. City of Detroit,* 866 F.2d 839 (6th Cir.1989) (RICO applies to municipal corporations), *cert. denied,* 497 U.S. 1003, 110 S.Ct. 3236, 111 L.Ed.2d 747 (1990); *Republic of the Phil. v. Marcos,* 862 F.2d 1355, 1358 (9th Cir.1988) (holding the Republic of the Philippines to be a "person" under § 1961(3) able to bring a civil RICO action), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989); *State of Mich., Dep't of Treasury v. Fawaz,* 848 F.2d 194 (6th Cir.1988) (disagreeing with the district court that a state is not a "person" within the meaning of RICO); *Pa. v. Cianfrani,* 600 F.Supp. 1364 (E.D.Pa.1985) (a state can sue a senator for RICO fraud); *Ill. Dep't of Rev. v. Phillips,* 771 F.2d 312, 317 (7th Cir.1985) (a state department of revenue may be a proper RICO plaintiff); *cf. Pfizer,* 434 U.S. at 308, 98 S.Ct. 584 (holding foreign sovereigns to be "persons" within the meaning of § 4 of the Clayton Act, which contains language virtually identical to

§ 1964(c)).[18]

My conclusion is supported by Congress' requirement that courts read the provisions of RICO broadly. *See* Pub.L. No. 91–452, § 904(a), 84 Stat. 947 (1970) (providing that RICO "shall be liberally construed to effectuate its remedial purpose"); *Bonanno,* 879 F.2d at 27. The Supreme Court has reiterated this mandate time and time again. *See, e.g., Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497–98, 105 S.Ct. 3275 (1985) ("RICO is to be read broadly .... RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime."); *Russello v. United States,* 464 U.S. 16, 26, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("[T]he RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots."). To conclude that foreign sovereigns may not bring civil RICO actions would frustrate Congress' purpose in enacting a powerful and broad statute to combat and punish illegal racketeering activity. Permitting suits by this Plaintiff, on the other hand, accords fully with Congress' intention that RICO "not merely compensate victims but turn them into prosecutors ... dedicated to eliminating racketeering activity." *Rotella v. Wood,* 528 U.S. 549, 557, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000).

It would make little sense to curtail the efforts of foreign governments to seek redress under civil RICO for harms suffered abroad as a result of organized crime originating in the United States. To so restrict the effective scope of RICO would be to discount the impact on other countries of racketeering activities originating in the United States. *Cf. Pfizer, Inc. v. Gov't of India,* 434 U.S. 308, 315, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978) ("If foreign plaintiffs were not permitted to seek a remedy for their antitrust injuries, persons doing business both in this country and abroad might be tempted to enter into anticompetitive conspiracies affecting American consumers in the expectation that the illegal profits they could safely extort abroad would offset any liability to plaintiffs at home.").

Defendants rely heavily on the Second Circuit case *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20 (2d Cir.1989), to support the proposition that governmental entities are not "persons" within the meaning of § 1961(3). I do not read *Bonanno* so expansively. *Bonanno,* however, addressed only the question of whether the *United States* could bring a civil RICO claim, and its holding and rationale are clearly limited to creating a narrow exception for the federal government. The court noted that when Congress intended to make a particular RICO provision applicable to the United States, it specifically and explicitly included the United States in the text. *See Bonanno,* 879 F.2d at 22 (referencing §§ 1963, 1964(b), and 1964(d)). The court reasoned that because Congress omitted any specific textual reference to the United States in § 1964(c), it likely intended to exclude the United States from civil RICO suits. *Id.* The court's conclusion was further constrained by the fact that "Congress ordinarily expresses its intention to render a statutory provision applicable to the United States[ either] by explicit refer-

---

18. Although many courts ultimately refuse to hold the governmental units liable as RICO defendants, *see Frooks,* 997 F.Supp. at 457 (compiling cases), those dispositions turn not on whether the entities considered are "persons," but rather on whether they could fulfill other elements of the RICO liability case, *see,* *e.g., Nu–Life,* 779 F.Supp. at 251 (finding the City of New York to be clearly within RICO's definition of "person" but nonetheless holding that the City could not be liable because it was incapable of forming the intent necessary to establish its commission of two predicate acts).

ence to the United States in the operative language of the statute of by explicit inclusion of the United States in the statutory definition of the object or objects affected by the law." *Id.*

This reasoning applies only to the United States, and a more expansive application is not warranted. As the Second Circuit has explained in *Bonanno,* the United States is mentioned in several enumerated RICO provisions under which it alone may enforce the act. *See* 18 U.S.C. § 1963 (authority to commence criminal prosecutions and seize property), § 1964(b) (authority to obtain injunctive relief and set bonds), § 1964(d) (authority to use criminal liability as estoppel in other civil actions). In light of these provisions, the court determined that to disallow the United States from bringing civil suit (and from reaping treble damages) would not adversely impact its ability to enforce RICO. *See Att'y Gen. of Canada,* 103 F.Supp.2d at 148. Foreign governmental entities, in contrast to the United States, do not benefit from any specifically enumerated power of enforcement under RICO, other than the civil right of action. The advantages provided to the United States cannot serve as a basis for denying to foreign governmental entities all access to civil RICO. In other words, the fact that Congress specifically intended to ensure that the United States would be able to effectively punish racketeering cannot serve as a basis for the conclusion that Congress intended to prevent foreign governments injured by racketeering from seeking redress under RICO. *Cf. Georgia v. Evans,* 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (1942) (holding that states have the ability to bring suit under the treble damages civil action provision of antitrust

laws even though the United States is forbidden to do so because the rights afforded the United States under the antitrust laws are not extended to the states). Clearly, the United States and foreign governments stand on very different footing when seeking to enforce RICO, and I therefore find *Bonanno's* primary analysis inapplicable to this case.[19]

The *Bonanno* court went on, however, to support its initial narrow reasoning with the broader interpretive principle that a term used in one provision of a statute usually has the same meaning in other provisions unless Congress denotes otherwise. *See id.* at 22–23. Because RICO uses the term "person" to describe both those who may sue under RICO and those who may be subject to the expansive civil and criminal liability imposed by RICO, *compare* 18 U.S.C. § 1962 ("It shall be unlawful for any person ....") *with* § 1964(c) ("Any person injured in his business or property ... may sue ....") *with* § 1965(a) (providing for civil actions "against any person"), the court inferred that Congress intended the term "person" to be limited to those entities who could also be a RICO defendant, *id.* at 22–23. The court then reasoned that because the United States is immune from suit under sovereign immunity principles, it cannot be a defendant under RICO and therefore cannot be a proper plaintiff, either. *Id.* at 23. The court cited *Cooper,* 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (finding the United States excluded from the definition of "person" under § 7 of the Sherman Act) as analogous.

Defendants track this reasoning to advance the argument that a foreign sovereign can only be a RICO "person" if it could also be a RICO defendant. Because

---

**19.** Relying on *Evans,* the *Bonanno* court itself deliberately restricted its reasoning to the United States by noting that the United States has unique avenues of redress under RICO unavailable to other governments. *See Bonanno,* 879 F.2d at 25.

the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, ordinarily precludes the courts from hearing suits against foreign sovereigns under RICO, Defendants argue, they cannot be RICO defendants, and, hence, cannot be RICO plaintiffs.

I disagree. While at first glance the *Bonanno* decision would appear to support Defendants' argument, it is clear that its application is limited to the narrow issue before the court in that case. The interpretive rule cited by that court is an accepted maxim of statutory construction. *See, e.g.*, 2A N. Singer, *Sutherland on Statutory Construction* § 47.07, at 133 (4th ed.1984); *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 238–39, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) ("Without strong evidence to the contrary, we doubt that Congress intended the same phrase to have significantly different meanings in two adjoining paragraphs of the same subsection."); *Cooper*, 312 U.S. at 606, 61 S.Ct. 742 ("It is hardly credible that Congress used the term 'person' in different senses in the same sentence."). The rule is not, however, "inescapable," *see Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961), and courts need not apply it to the exclusion of other interpretive guideposts which better indicate the meaning of a statutory provision, *see Gutierrez*, 528 U.S. at 258, 120 S.Ct. 740 (noting even a generally accepted canon of interpretation "does not necessarily have the strength to turn a tide of good cause to come out the other way"); *accord* Richard A. Posner, *Statutory Interpretation—In the Classroom and in the Courtroom*, 50 U. Chi. L.Rev. 800, 806 (1983) ("The usual criticism of the canons ... is that for every canon one might bring to bear on a point there is an equal and opposite canon, so that the outcome of the interpretive process depends on the choice between paired opposites.").

The *Bonanno* court enlists that canon of statutory construction to support the conclusion that Congress did not intend the term "person" to include the United States. I see no reason to conclude, however, that the *Bonanno* court intended to generalize from this conclusion to the insupportable result that Congress intended to subject *every* RICO plaintiff to potential civil and criminal liability. Were such reasoning extended to its logical conclusion, the States of the United States, which have Eleventh Amendment immunity from federal civil suits absent congressional abrogation or self-waiver, *see Dellmuth v. Muth*, 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989); *Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 472–73, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987) (plurality opinion), would not be able to bring civil suit under any law that identifies plaintiff and defendant with the same term. Yet courts, as *Bonanno* itself recognized, have permitted states to sue even when they would be immune from suit under identical language in the same statute. *See, e.g., Evans*, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (allowing states to sue as "persons" in the antitrust context); *Bonanno*, 879 F.2d at 25 (citing *Alcorn County v. United States Interstate Supplies, Inc.*, 731 F.2d 1160 (5th Cir.1984)). I read *Bonanno* only as employing a general presumption for a limited purpose, namely, to support its narrow and otherwise fully defensible holding; and it is the holding, and not the general presumption, by which I am bound. *Cf. Alexander v. Sandoval*, 531 U.S. 1049, 121 S.Ct. 1511, 1517, 149 L.Ed.2d 517 (2001); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63 n. 4, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

Sound reasons counsel against extending the *Bonanno* exception to foreign sovereigns. Principles of comity generally permit foreign governments access to U.S.

courts. *See, e.g., Pfizer*, 434 U.S. at 318–19, 98 S.Ct. 584 ("This Court has long recognized the rule that a foreign nation is generally entitled to prosecute any civil claim in the courts of the United States upon the same basis as a domestic corporation or individual might do. 'To deny him this privilege would manifest a want of comity and friendly feeling.'") (quoting *The Sapphire*, 78 U.S. (11 Wall.) 164, 167, 20 L.Ed. 127 (1870)). This is true even in the face of foreign immunity from suit as a civil defendant. *See, e.g., The Schooner Exchange*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 1 *Restatement (Third) of Foreign Relations Law* §§ 451 & cmt. a, 461 cmt. d, 464. Thus, a sovereign's enjoyment of an immunity-based defense to suit does not entail a concomitant limitation upon its access to the courts.

Defendants argue that the "clear statement rule" mandates exclusion of foreign governmental entities from the definition of "person." The "clear statement rule" excludes states from statutory coverage unless Congress explicitly abrogates their sovereign immunity under the Eleventh Amendment. *See Will*, 491 U.S. at 65, 109 S.Ct. 2304 ("Congress should make its intention 'clear and manifest' if it intends to pre-empt the historic powers of the States . . . ."). The central focus in *Will* was whether states were "persons" subject to § 1983 liability. *Id.* at 60, 109 S.Ct. 2304. The Court first looked to the language of the statute and determined that reading "person" to include states would be "decidedly awkward." *Id.* at 63, 109 S.Ct. 2304. The Court then buttressed its initial reading with an analysis of Eleventh Amend-ment immunity and principles of federalism. *See id.* at 65–70, 109 S.Ct. 2304. The Court held that those serious concerns should not be overridden absent "clear congressional intent that States be held liable." *Id.* at 70, 109 S.Ct. 2304.

*Will* is not relevant to the present controversy. Heavily reliant on principles of constitutional immunity and domestic federalism, the Court's reasoning in *Will* applied exclusively to the *states* and their exposure to suit as *defendants*. As discussed above, I am confronted with a very different question, namely the ability of *foreign sovereigns* to sue as *plaintiffs*. Assuming, however, that it were somehow possible to extend *Will* to foreign sovereigns, the clear statement rule would even then only affect their status as defendants. Having rejected the premise that only entities to whom immunity from RICO liability is unavailable may sue under RICO, I see no place in my analysis for the clear statement rule.[20]

I therefore hold that Plaintiff is a "person" under § 1964(c). I make no comment on whether or not it may also be a proper RICO defendant.

## B. Has Plaintiff Alleged a Cognizable Injury to Business or Property?

The EC alleges that Defendants' racketeering activity has resulted in injuries in the form of lost tax revenues and increased law enforcement costs. Numerous authorities support the proposition that such claimed damages are, at bottom, claims for lost money. *Cf. Reiter v. Sonotone Corp.*, 442 U.S. 330, 344, 99 S.Ct.

---

**20.** Further, I see little reason why RICO could not be read as permitting, as an initial inquiry, all "persons" both to sue and be sued, but then allowing certain defenses, such as immunity, to factor into the analysis as applicable. In other words, a foreign sovereign or a state may be a RICO "person" as defined by the language of the statute but nevertheless immune from being a RICO defendant on other grounds. Accordingly, even if Defendants are correct in asserting that "person" means the same for both RICO plaintiffs and RICO defendants, the concerns they express are not inextricably implicated.

2326, 60 L.Ed.2d 931 (1979). Such inherently economic losses constitute injury to "property" within the meaning of § 1964(c). *Phillips,* 771 F.2d at 314; *Marcos,* 862 F.2d at 1358 (Republic of Philippines has standing to sue under § 1964(c) to recover money fraudulently obtained from it by its former president); *City of N.Y. v. Joseph L. Balkan, Inc.,* 656 F.Supp. 536, 543 (E.D.N.Y.1987) (holding tangible damage to the New York City sewer system is injury to "business or property" under § 1964(c)); *City of N.Y. v. JAM Consultants, Inc.,* 889 F.Supp. 103, 106 (S.D.N.Y.1995) ("The loss of an employee's faithful performance of his duties is an injury to the employer which is cognizable under RICO, and the fact that the employer also happens to be a municipality does not alter this conclusion."); *see also Att'y Gen. of Canada,* 103 F.Supp.2d at 152 ("Because Canada was compelled to increase law enforcement expenditures to combat Defendants' alleged smuggling operations, it appears that such expenses are compensable as injury to Canada's property."). The Second Circuit has characterized the object of a scheme to defraud a sovereign of taxes due on goods illegally smuggled into its territory as aimed at depriving the sovereign of "its *right* to obtain property, its *right* to be paid mon-

ey. To prove the existence of a scheme to defraud the Canadian government the prosecution had to prove the existence of such a right. Without it there was no 'money or property.'" *Pierce,* 224 F.3d at 165 (emphasis added).

Relying principally on the Second Circuit's decision in *Town of West Hartford v. Operation Rescue,* 915 F.2d 92 (2d Cir. 1990), Defendants reject this conclusion, maintaining that Plaintiff's injuries are not cognizable because governmental entities must satisfy an additional (albeit tacit) standing requirement under civil RICO. In my view, Defendants overstate both the parallel construction of the federal Antitrust and Racketeering statutes and the extent to which courts in this circuit have overcome the Supreme Court's reluctance to supplement civil RICO's standing requirements.

**1. *Sedima* and RICO's Legislative History**

 The analysis of Defendants' argument must begin with a discussion of the Supreme Court's rejection of a "competitive injury"[21] requirement in *Sedima.* Under the Clayton Act, a plaintiff must demonstrate "competitive injury." *See,*

---

**21.** As discussed *infra,* it is not clear to me that a distinction can be maintained between the "competitive injury" rejected by the Supreme Court in *Sedima* and the "commercial injury" that Defendants would have this court require. Defendants themselves offer no distinction except for their conclusory statement that "there is a world of difference between a 'competitive' injury and a 'commercial' one." (Defs.' Joint Reply Mem. in Support of Mot. to Dismiss Amazonas and EC Compls. Under 12(b)(6) at 14 n. 7.) Neither Defendants nor any court of which I am aware have ever articulated this "world of difference." To the contrary, though frequently appearing in the disjunctive, the terms nevertheless appear to embody the same idea. *See, e.g., Sedima,* 473 U.S. at 486 n. 6, 105 S.Ct. 3275; *Bennett v.*

*Berg,* 685 F.2d 1053, 1059 (8th Cir.1982) ("We conclude that an allegation of commercial or competitive injury is not required by the RICO Act."); *Bunker Ramo Corp. v. United Bus. Forms, Inc.,* 713 F.2d 1272, 1288 (7th Cir.1983) ("[T]his court held that competitive or commercial injury is *not* required in order to state a RICO civil claim."); *Margolis v. Republic Nat'l Bank of N.Y.,* 585 F.Supp. 595, 597 (S.D.N.Y.1984) ("We agree that such an injury should not be equated to the sort of 'competitive or commercial injury' which must be shown in an antitrust case."). Nevertheless, for the purposes of discussing the *Sedima* opinion, I assume *arguendo* that the concepts are capable of meaningful dissociation.

*e.g., Bonanno,* 879 F.2d at 24. The Supreme Court has concluded that civil RICO, by contrast, includes no such requirement. *Sedima,* 473 U.S. 479, 105 S.Ct. 3275; *see also Phillips,* 771 F.2d at 314 ("While the Supreme Court held that the 'business and property' phrase in the Clayton Act refers only to commercial interests and competitive injuries ... this is not the case under RICO.") (internal citations omitted); *cf. Nat'l Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (holding that proof of an economic motive is not required under § 1964(c)); *Bonanno,* 879 F.2d at 24 (comparing the Clayton Act "competitive injury" prerequisite to a rejection of a similar prerequisite in the RICO context and noting the "policy against saddling RICO with restrictive rulings born of the theoretical underpinnings of the antitrust laws; specifically, limitations on standing and strict causation requirements tied to notions of economic competition").

In *Sedima,* the Supreme Court rejected the conclusion that, by analogy to the Clayton Act, 18 U.S.C. § 1964(c) permits private actions only against defendants who had been convicted on criminal charges, and only where there had occurred a "racketeering injury." *Sedima,* 473 U.S. at 485, 105 S.Ct. 3275. The Court first rejected the imposition of a "racketeering injury" requirement:

> Given that "racketeering activity" consists of no more and no less than commission of a predicate act, § 1961(1), we are initially doubtful about a requirement of a "racketeering injury" separate from the harm from the predicate acts. A reading of the statute belies any such requirement.... If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or

property, the plaintiff has a claim under § 1964(c). There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement.

*Id.* at 495, 105 S.Ct. 3275. The Court went on to reject, in a footnote, the dissent's argument favoring the imposition of a "competitive injury" requirement:

> as the court below stated, Congress nowhere suggested that actual anti-competitive effect is required for suits under the statute. The language it chose, allowing recovery to "[a]ny person injured in his business *or property,*" § 1964(c) (emphasis added), applied to this situation, suggests that the statute is not so limited.

*Id.* at 497 n. 15, 105 S.Ct. 3275 (emphasis in *Sedima* ).

The Court's rejection of "competitive injury" as a prerequisite to standing was ultimately based upon its recognition that the underlying rationales of RICO and the federal antitrust laws are divergent. As Judge Posner of the Seventh Circuit has noted, "analogies to Section 4 of the Clayton Act are forced." *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 457 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982). The most prominent difference is, of course, that unlike RICO, the antitrust laws are not predominantly concerned with promoting market efficiency and competition. *See Schacht v. Brown,* 711 F.2d 1343, 1358 (7th Cir.1983) ("[T]o the extent that antitrust law and policy are increasingly concerned primarily with market efficiency rather than the deleterious effect of concentrated market power itself, analogies to that body of law become increasingly irrelevant, since the exercise of social power by organized crime is thought to be *malum in se.*"). In contrast to the antitrust laws,

which also allow for recovery of treble-damages, RICO's purpose is to prevent violators from enjoying "the fruits of [their] ill-gotten gains." *United States v. Turkette*, 452 U.S. at 585, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *see also* 115 Cong. Rec. 602 (1970) (remarks of Sen. Hurska); *Ralston v. Capper*, 569 F.Supp. 1575, 1580 (E.D.Mich.1983) ([RICO] is precisely designed to ruin those individuals and enterprises it is aimed at. It is not designed to increase their efficiency or protect them from insolvency. Thus, the rationale behind the antitrust standing concerns have no applicability [in the RICO context].); 115 Cong. Rec. 9567 (remarks of Sen. McClellan). Further emphasizing these differences, the Supreme Court noted as "significant" that:

> a previous proposal to add RICO-like provisions to the Sherman Act had come to grief in part precisely because it "could create inappropriate and unnecessary obstacles in the way of ... a private litigant [who] would have to contend with a body of precedent—appropriate in a purely antitrust context—setting strict requirements on questions such as 'standing to sue' and 'proximate cause.'" In borrowing its "racketeering injury" requirement from antitrust standing principles, the court below created exactly the problems Congress sought to avoid.

*Sedima*, 473 U.S. at 488–89, 105 S.Ct. 3275 (citations omitted).

In rejecting the lower court's "racketeering injury" requirement and the dissent's suggestion that "competitive injury" should be made a prerequisite to standing under § 1964, the Court in *Sedima* declined to read into the racketeering statute an unstated requirement that civil RICO injuries be susceptible of characterization as "separate from the harm of the predicate acts":

> Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Those acts are, when committed in the circumstances delineated in § 1962(c), "an activity which RICO was designed to deter." Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts.

*Id.* at 497, 105 S.Ct. 3275. I am foreclosed, therefore, by *Sedima* from creating any impediment to standing under 18 U.S.C. § 1964(c) that would constrain the Supreme Court's broad construction of the statutory language at issue.

**2. *Hawaii* Cannot Be Construed to Require A New Standing Requirement Under 1964(c)**

*Sedima* teaches that the harms caused by predicate acts cannot be categorized depending upon the status of the "person" who suffers racketeering injury. Defendants summon *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262–56, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), and *Town of West Hartford*, 915 F.2d at 103–04, in an attempt to circumvent the Supreme Court's clear resistance to saddling RICO plaintiffs with supplemental standing requirements borrowed from the federal antitrust context. Defendants argument that such requirements are not abjured if the RICO plaintiff is a governmental entity finds no support from *Hawaii;* and although *Town of West Hartford* speaks to the issue, it does so glancingly and in *dicta,* and its conclusions in this regard are therefore not controlling on the issue of whether or not the EC has standing to sue under § 1964(c).

In *Hawaii*, the Supreme Court interpreted the phrase "business or property" in § 4 of the Clayton Act as limiting a state's recovery to injuries to its commercial interests. "When the State [of Hawaii] seeks damages for injuries to its commercial interests, it may sue under § 4 [of the Clayton Act]. But where, as here, the state seeks damages for other injuries, it is not properly within the Clayton Act." *Hawaii*, 405 U.S. at 264, 92 S.Ct. 885. The Court's distinction between actionable injury to "proprietary" or "commercial" interests and injury to "other," "quasi-sovereign," or "general economy" interests, which are not actionable under Section 4 of the Clayton Act rested upon three distinct rationales. First, the Court concluded that Congress declined to include compensation for sovereign injury among the Clayton Act's remedies:

> Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation. In enacting these laws, Congress had many means at its disposal to penalize violators. It could have, for example, required violators to compensate federal, state, and local governments for the estimated damage to their respective economies caused by the violations. But, this remedy was not selected.

*Id.* at 262, 92 S.Ct. 885. Second, the Court was reluctant to read into the Clayton Act an invitation to sovereigns to seek double recoveries:

> A large and ultimately indeterminable part of the injury to the 'general economy,' as it is measured by economists, is no more than a reflection of injuries to the 'business or property' of consumers, for which they may recover themselves

under § 4. Even the most lengthy and expensive trial could not in the final analysis, cope with the problems of double recovery inherent in allowing damages for harm both to the economic interests of individuals and for the quasi-sovereign interests of the State. At the very least, if the latter type of injury is to be compensable under the antitrust laws, we should insist upon a clear expression of a congressional purpose to make it so, and no such expression is to be found in § 4 of the Clayton Act. *Id.* at 264, 92 S.Ct. 885. Third, the Court analyzed the legislative history of § 4 of the Clayton Act, and ascertained that it is "the only provision [of the Clayton Act] authorizing recovery in damages by the United States, and ... limits that recovery to damages to 'business or property.'" *Id.* at 264–65, 92 S.Ct. 885.

> The legislative history of [§ 4 of the Clayton Act] makes it quite plain that the United States was authorized to recover, not for general injury to the national economy or to the Government's ability to carry out its functions, but only for those injuries suffered in its capacity as a consumer of goods and services. "The United States is, of course, amply equipped with the criminal and civil process with which to enforce the antitrust laws. The proposed legislation, quite properly, treats the United States solely as a buyer of goods and permits the recovery of actual damages suffered."

*Id.* at 255, 92 S.Ct. 885 (quoting S.Rep. No. 619, 84th Cong., 1st Sess., 3 (1955)).

The holding in *Hawaii* was subsequently summarized by the Supreme Court as follows: "[t]here we held that injury to a state's total economy, for which the state sought redress in its *parens patriae* capacity, was not cognizable under § 4 [of the Clayton Act]." *Reiter*, 442 U.S. at 341, 99

S.Ct. 2326 (holding that consumers who pay a higher price for goods purchased for personal use as a result of antitrust violations sustain an injury in their "property" within the meaning of Section 4 of the Clayton Act). The Court further noted in *Reiter* that "[a] central premise of our holding in *Hawaii* was concern over duplicative recoveries" and emphasized, again echoing *Hawaii,* that "[t]he essence of the antitrust laws is to ensure fair price competition in an open market." 442 U.S. at 342, 99 S.Ct. 2326.

This review of the Supreme Court's reasoning in *Hawaii* demonstrates that it cannot be transposed into the civil RICO context, and is, in any event, patently insufficient to support the interpolation of a "commercial injury" standing requirement into § 1964(c). The first *Hawaii* rationale is inapplicable for the reasons discussed *supra,* i.e., it is clear that Congress' overarching purpose in enacting civil RICO was not, except incidentally, to ensure against blows to the free market system. To insist upon allegations of market-related injury as a pre-condition to bringing suit is therefore incompatible with the very object of creating the civil RICO cause of action. The second *Hawaii* rationale is inapplicable in the RICO context for the simple reason that actions like the ones contemplated by Plaintiff here cannot be brought by individual citizens. No citizen of any EC Member State has the right to collect taxes or the obligation to ensure against a violation of such laws; thus, none could claim injury to his or her "property" on account of lost taxes or increased law enforcement costs. Finally, the third *Hawaii* rationale—Congress' expressed desire to limit the ability of the United States to recover under the antitrust laws only to injuries "suffered in its capacity as a consumer of goods and services"—finds no parallel in RICO's legislative history.

### 3. *Town of West Hartford* Is Not Controlling

Apart from *Hawaii,* Defendants rest their argument upon the Second Circuit's opinion in *Town of West Hartford v. Operation Rescue,* 915 F.2d 92 (2d Cir.1990). (*See* Defs.' Joint Mem. in Support of Mot. to Dismiss Colombian and EC Compls. Under 12(b)(6) at 16; May 1, 2000 Tr. at 123.) Such reliance is misplaced. The court in *Town of West Hartford* held that Plaintiffs' claims were so patently implausible that subject matter jurisdiction was lacking on this ground alone. *Town of West Hartford,* 915 F.2d at 93. The holding in *Town of West Hartford* thus falls squarely within a narrow class of cases holding that the exercise of jurisdiction is improper where the complaint, on its face, sets forth no plausible claim for relief. *See Steel Co.,* 523 U.S. at 89, 118 S.Ct. 1003 ("Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'") (citing *Oneida Indian Nation of N.Y. v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974)). Having dismissed plaintiffs' claims on this basis, the court did not, in fact, reach the question of whether or not sovereign plaintiffs suing under civil RICO must meet a heightened standing requirement.

Having abandoned the state and federal civil rights claims originally alleged in conjunction with its RICO claim based upon predicate acts of extortion, the amended complaint in the *Town of West Hartford* case alleged jurisdiction only under 18 U.S.C. § 1964. On appeal from the grant of a preliminary injunction barring defendants-appellants from entering or remaining upon the property or offices of the

Summit Women's Center in the Town of West Hartford, Connecticut, or impeding access thereto, the Second Circuit panel applied the following test for determining whether federal question jurisdiction existed to hear the Town's claims: "whether the cause of action alleged is *so patently without merit* as to justify ... the court's dismissal for want of jurisdiction." *Town of West Hartford*, 915 F.2d at 100 (internal citations and quotations omitted) (emphasis in original). The court first reviewed the Town's contention that defendants directly extorted the Town. Having set forth the definition of "extortion" under 18 U.S.C. § 1951(b), the court first rejected the contention, apparently not meaningfully argued by the Town on appeal, that defendants sought by their activities to extort a "softened response" to their protests:

> however broadly the statute is read, the term 'property' cannot plausibly be construed to encompass altered official conduct. *The contention is so blatantly implausible* that its rejection requires no aid from the rule of lenity, which is clearly pertinent to the construction of this criminal statute.... In our view, [the Town's incurring overtime police expense as a result of defendants' activities] *does not provide a colorable basis to claim a Hobbs Act violation.* Virtually any conduct that elicits a governmental response will require activity by one or more salaried government employees. *It is simply not tenable* to translate the activation of such a response into a Hobbs Act obtention of 'property,' and it is not surprising that the Town has not pressed such a theory in this litigation. We note further that it would be difficult to construe the defendant's activities as described in the complaint, consisting of resistance to police efforts to clear protesters from the Center and assertedly false accusations of police brutality in

doing so, as the wrongful use of actual or threatened force, violence or fear within the meaning of section 1951(b). We also note the first amendment implications of any ruling that, for example, the publication of a paid advertisement alleging police brutality ... violates a federal statute which defines a felony punishable by twenty years imprisonment and a fine of $10,000.

*Id.* at 101–02 (internal citations and quotations omitted) (emphasis added).

The court next rejected the Town's claim that it suffered injury as a result of the defendants' alleged extortion of the Center.

> Assuming arguendo that interference with the Center's operations constituted extortion of the Center, the role of the Town was, through its police agencies, to terminate the interference and the resulting extortion of the Center. The Town apparently is attempting to contend that (1) by endeavoring to impede or delay the Town's efforts to terminate defendants' extortion of the Center, (2) defendants 'used' the Town to extort the Center, thereby (3) extorting the Town.... *So bizarre a construction of the Hobbs Act affronts common sense,* much less the rule of lenity.

915 F.2d at 102 (emphasis added). The court reasoned that this argument must be rejected because the Town was seeking to recover money damages for injuries suffered by the Center, recovery of which could not compensate for harm to the Town *per se.* As such, the Town lacked standing because, by suing in its capacity as *parens patriae,* it failed to seek redress for an injury to an interest separate from the interests of particular individuals.

Having concluded that the Town's inability to assert "any plausible Hobbs Act violation against it results in a failure to

establish 'racketeering activity' within the meaning of 18 U.S.C. § 1962(c)," the court proceeded to address, in *dicta*, whether or not the Town had successfully alleged injury to "business or property" under 18 U.S.C. § 1964(c). Looking to *Hawaii* and *Reiter* for guidance, the court referred to, but did not explicitly adopt the limitation upon the standing of sovereign governmental entities to sue under the Clayton Act "only when it functions 'as a party to a commercial transaction.'" *Id.* at 104. Having noted that "[i]njuries of the sort asserted by the Town do not fall within the ambit of section 1964(c)," the court went on to hold, in the very next sentence, that *"[w]e need not rule ... that the Town's view of section 1964(c) is so implausible that, standing alone, it would warrant dismissal of [its] RICO claim for failure of subject matter jurisdiction." Id.* (emphasis added).

*Town of West Hartford* held only that dismissal of the Town's complaint was warranted due to its "meritless invocations of the Hobbs Act." *Id.* Far from mandating a "commercial injury" standing requirement under civil RICO, *Town of West Hartford* stands only for the limited proposition that "governmental response to unlawful acts is not 'property' within the meaning of the Hobbs Act... (neither 'altered official conduct,' such as the dismissal of criminal charges, nor the expenditure of public funds for police overtime, constitutes property within the meaning of the Act)." *United States v. Arena,* 180 F.3d 380, 393 (2d Cir.1999), *cert. denied,* 531 U.S. 811, 121 S.Ct. 33, 148 L.Ed.2d 13 (2000). *Town of West Hartford's* holding does not, therefore, address the question at issue here.

I am aware that the court in *Attorney General of Canada* embraced a broader reading of the opinion: "[i]n short, *Town of West Hartford* requires injury to the government's commercial interests in RICO claims." *Att'y Gen. of Canada,* 103 F.Supp.2d at 154. Choosing to ignore the obvious implication of the phrases "[w]e need not rule ..." and "[s]uffice it to say ...", Judge McAvoy read *Town of West Hartford* as appending a novel "commercial injury" requirement, applicable only to sovereign plaintiffs, to RICO's standing requirement. The court in *Attorney General of Canada* did so in full recognition of the problems associated with reaching this conclusion:

> The Supreme Court's wording in *Hawaii* requiring "damages for injuries to its commercial interests" precluded the types of damages sought in *Town of West Hartford.* However, the reasons for the holding in *Hawaii* seemingly *did not apply to the facts in that case.* The Town of West Hartford sought to recover, at least in part, for discrete injuries to itself—over $42,000 in overtime wage expenses. Unlike in *Hawaii,* the Town of West Hartford itself actually sustained these injuries, they were readily ascertainable (presumably, one could simply refer to the Town's payroll records), and there was no possibility of duplicative recoveries because no other individuals or entities would be able to recover those damages sustained by the Town. *Notwithstanding these distinctions, the extension of the liberal RICO injury requirement beyond competitive injury [in Sedima], and the difference between the injury requirement in RICO and § 4 of the Clayton Act,* the Second Circuit held that the injuries sustained by the Town of West Hartford constituted non-cognizable injury to the Town's general economic well-being and/or its ability to carry out its functions.

*Id.* at 154–55 (internal citations omitted) (emphasis added). The court went on to note in the next sentence that it "has been

unable to find any Supreme Court or Second Circuit cases that have overruled, abrogated, or otherwise departed from this holding." *Id.* I respectfully decline to follow this obviously strained and reluctant conclusion.

In order to view *Town of West Hartford* as Defendants would, this court would be required not only to ignore the clear holding of that case that the Town's complaint was so lacking in merit that the court could not exercise subject matter jurisdiction over the case, but to impose, as a precondition to standing to sue under civil RICO, a standard whose definition could only be inferred. *Town of West Hartford* gives no positive definition of the standing requirements Defendants would have this court impose; the most that can be extrapolated from the relevant portion of that decision is that a governmental entity is foreclosed from recovering for injuries to its "general economy" or to "its ability to carry out its functions," and that the *sine qua non* for standing must be in some sense analogous to the "gloss" in *Reiter* to the effect that recovery is permitted only when the governmental entity "functions 'as a party to a commercial transaction.'" *Town of West Hartford,* 915 F.2d at 104 (quoting *Reiter,* 442 U.S. at 341–42, 99 S.Ct. 2326). Next, as discussed *supra, Sedima* very clearly prohibited the judicial creation of "amorphous standing requirement[s]" to bringing suit under RICO. Nevertheless, Defendants would have this court conclude that the Second Circuit imposed an almost certainly impermissible prerequisite to standing in violation of *Sedima.* As Judge McAvoy pointed out in the above-quoted passage, there is no compelling rationale in *Town of West Hartford.* for inferring a "commercial injury" requirement. That Defendants' reading of *Town of West Hartford* is both unnecessary and radical is clear also from the fact that none of the three policy bases articulated in the *Hawaii* opinion, discussed *supra,* is applicable in the RICO context.

No plausible reading of *Town of West Hartford* requires the inference of a novel standing requirement in order to reach its uncontroversial conclusion that the district court lacked subject matter jurisdiction to hear the Town's wholly implausible claims. In fact, the *Town of West Hartford* court explicitly stated that the plaintiffs' failure to satisfy the "business or property" requirement was inessential to its holding. The standard applied by the court in reviewing the granting of the preliminary injunction in *Town of West Hartford* was not whether or not plaintiff had succeeded in stating a claim upon which relief could be granted, but only whether or not plaintiff's claim is so "completely devoid of merit" that dismissal for lack of federal subject matter jurisdiction is warranted. *Id.* at 100. Finally, just as the court in *Attorney General of Canada* could locate no Supreme Court or Second Circuit precedent overturning *Town of West Hartford,* this court has located no precedent from the Supreme Court or Second Circuit (or any other circuit, for that matter) explicitly mandating (as *Town of West Hartford* clearly did not) a "commercial injury" standing requirement of the sort argued for by Defendants.

For the foregoing reasons, I find no indication that Congress intended to append to 18 U.S.C. § 1964(c) a "commercial injury" requirement for governmental entity standing.

### 4. The EC Has Not Suffered Injury to Its Business or Property

■ My reluctance to hang Defendants' preferred reading upon the slender reed of the Second Circuit's *dicta* in *Town of West Hartford* does not, however, end the inquiry. Even though it need not al-

lege a "competitive injury," Plaintiff must nevertheless demonstrate that Defendants' violation of RICO caused injury to Plaintiffs' property. As described *infra*, the EC's budget cannot, as a matter of law, be diminished as a result of the smuggling activities alleged in the EC Complaint. For this reason, the EC lacks standing to bring suit under 1964(c) and the EC Complaint must be dismissed.

The EC lacks standing under 1964(c) because even assuming that all the allegations set forth in the EC Complaint are true, it cannot show that it has suffered any injury as a result of Defendants' illegal acts. Article 272 of the EC Treaty sets forth the EC's budgetary procedures.[22] Under those procedures, the Council of the European Parliament (the "Council") establishes a draft budget for the EC on the basis of a preliminary draft prepared by the European Commission (the "Commission"). This draft budget is then sent to the European Parliament for review and amendment. After further review by the Council and the Commission, the amended budget is declared by the President of the European Parliament to have been finally adopted

Pursuant to regulations promulgated by the Council, the Member States must fully fund the EC's budget requirements, so long as the EC operates within an overall budgetary ceiling. *See* Council Regulation 1550/2000 of May 2000 implementing Decision 94/728/EC on the system of the European Communities' own resources, Article 5, OJ 2000 L 13% (the "Own Resources Regulation"); *see also* Council Regulation 1653/89 of 29 May 1989 on the definitive uniform arrangements for the collection of own resources accruing from VAT, OJ 1989L 15% (the "VAT Own Resources Regulation"). Pursuant to the Own Resources Regulation, each individual Member State contributes an amount calculated with reference to the amount each Member State receives in agricultural levies, customs duties and VAT, as well as on the basis of its GNP.

The contribution based on GNP, referred to as the "fourth resource," is calculated in "such a manner that it fully covers that part of the budget not financed from" the other three sources. Own Resources Decision, Article 2(1)(c). The GNP "own resource" is an amount calculated as a percentage of the GNP of each individual Member State. As explained by the Court of Auditors, "[t]his resource forms part of the budget funding and is used to make up the difference between planned expenditure and the other resources available (customs duties, agricultural duties and the VAT resource)." Own Resources Decision, Article 2(1)(d); Own Resources Regulation, Article 13. Thus, the fourth resource guarantees that the EC receives sufficient revenue to fund its budget.

Under EC law, therefore, the Member States' ability to collect taxes on cigarettes has no corresponding effect upon the ability of the EC to fund its budgetary require-

---

**22.** On May 24 and 25, 2001 I held a hearing, pursuant to Fed.R.Civ.P. 44.1, in order to supplement the record concerning whether or not, as a matter of law, Plaintiffs in the EC and Amazonas Cases had adequately alleged proximate cause, as required under 18 U.S.C. § 1964(c) and *Holmes*, 503 U.S. 258, 112, S.Ct. 1311, 117 L.Ed.2d 532 (the "44.1 Hearing"). (*See* May 3, 2001 Order at 3.) Plaintiffs and Defendants were invited to present expert testimony on relevant foreign law issues. The parties's experts made written submissions in advance of the 44.1 Hearing, which I considered in addition to their oral testimony. My interpretations, as set forth herein, are based on the experts' averments and upon my own research into the organization and proper interpretation EC law. I note that I have considered foreign law in this case only to the extent necessary to decide Defendants' motions to dismiss.

ments in any given year. Under the EC Treaty, in other words, the EC cannot suffer harm to its revenues as a result of Defendants' alleged cigarette smuggling. This is not to say, of course, that the individual Member States, who are ulti· mately responsible for funding the EC's budget, would not have been harmed by cigarette smuggling. If cigarettes were smuggled into one of the Member States thereby depriving that state of tax revenue, such smuggling would presumably have the effect of increasing the amount owed by that state to the EC in the form of the "fourth resource." But the Member States are not parties to this suit. Because the EC cannot suffer loss due to cigarette smuggling, and therefore cannot have suffered any injury to its business or property, it lacks standing to sue under 18 U.S.C. § 1964(c).

## VII. EC State Law Claims Must Be Dismissed Because Diversity Jurisdiction Is Lacking

■ There is no diversity jurisdiction over Plaintiff's state law claims because complete diversity between the parties is lacking. The Second Circuit has long recognized the "explicit and unequivocal" rule requiring complete diversity, and dismisses actions when aliens are on both sides of a matter. *See, e.g., Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 790 (2d Cir.1980) (citing *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975) (holding that diversity jurisdiction under 28 U.S.C. § 1332 is defeated by the presence of aliens both as plaintiffs and as defendants) (citing 1 Moore, Federal Practice P 0.75 at 709.6–7 (1974) and the cases cited therein)); *Int'l Shipping Co. v. Hy-*

dra Offshore, *Inc.*, 875 F.2d 388 (2d Cir. 1989) (affirming Rule 11 sanctions against an attorney for bringing a jurisdictionally defective complaint on an alien corporation's behalf against another alien corporation); *Franceskin v. Credit Suisse*, 214 F.3d 253 (2d Cir.2000) (holding that federal courts lack subject matter jurisdiction over state law claims among aliens).

## VIII. The EC's Motion to Amend its Complaint

■ The EC seeks to amend its complaint.[23] Leave to amend a party's pleadings "shall be freely given" by the court "when justice so requires." Fed. R.Civ.P. 15(a). Permission to amend is "within the discretion of the trial court" *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Leave should be freely granted unless the movant unduly delayed in bringing the request or brings it in bad faith or with a dilatory motive, or the proposed amendment would be unavailing or the non-movants would be unfairly prejudiced thereby. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). "[V]alid reasons for denying leave to amend include undue delay, bad faith or futility of the amendment." *Mackensworth v. S.S. American Merchant*, 28 F.3d 246, 251 (2d Cir.1994). "Mere delay ... absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny" leave to amend. *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2nd Cir.1981); *Richardson Greenshields Sec. Inc. v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987) (delay alone is insufficient). The party opposing a motion

---

**23.** The EC moves to join the following Member States as party plaintiffs in the EC Case: the Kingdom of Belgium, the Republic of Finland, the French Republic, the Hellenic Republic, the Federal Republic of Germany, the Italian Republic, the Grand Duchy of Luxembourg, the Kingdom of the Netherlands, the Portuguese Republic, and the Kingdom of Spain.

for leave to amend has the burden of establishing that granting such leave would be unduly prejudicial. *Saxholm AS v. Dynal, Inc.*, 938 F.Supp. 120, 123 (E.D.N.Y. 1996).

■ Defendants argue that where subject matter jurisdiction is lacking, a court is powerless to grant leave to amend a complaint, even where to do so would cure an obvious lack of jurisdiction. (*See* Defs.' Mem. in Opp. to Mot. to Amend EC Compl. at 3, 7.) Because I agree with Defendants on this point, I need not reach the question whether or not Defendants have succeeded in showing that the timing, or any other feature, of the EC's proposed amendment provides a basis for denying leave to amend.

Defendants rely upon *Pressroom Unions–Printers League Income Sec. Fund v. Cont'l Assurance Co.*, 700 F.2d 889 (2d Cir.1983). In *Pressroom*, a pension fund brought a complaint against fiduciaries under ERISA. The jurisdictional provisions of ERISA, however, do not authorize a pension fund to assert a cause of action. 29 U.S.C. § 1132(e)(1) gives the district courts "exclusive jurisdiction of civil actions under this subchapter brought by the Secretary [of Labor] or by a participant, beneficiary or fiduciary." Under the section of ERISA dealing with standing, the Secretary or a "participant, beneficiary or fiduciary" may bring an action for civil enforcement of the Act's fiduciary and other provisions. 29 U.S.C. § 1132(a). The court concluded that absent some indication that Congress intended to grant subject matter jurisdiction over suits by funds, § 1132(e)(1) "should be viewed as an exclusive jurisdictional grant." *Pressroom*, 700 F.2d at 892. The court in *Pressroom* went on to consider the fund's motion to amend the complaint and substitute plan participants as plaintiffs, which the court characterized as an effort "to

substitute a new action over which there is jurisdiction for one where it did not exist." *Id.* The Second Circuit noted "[t]he long-standing and clear rule is that if jurisdiction is lacking at the commencement of a suit, it cannot be aided by the intervention of a plaintiff with a sufficient claim," and concluded that the district judge, having decided that the court lacked subject matter jurisdiction to hear the fund's claims, had not abused his discretion in denying the fund's motion to amend. *Id.* at 893–94.

■ Resolution of questions concerning federal jurisdiction "depends on the facts as they exist when the complaint is filed." *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 830, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989). I have already concluded that dismissal of the EC's federal claims is warranted pursuant to Fed. R.Civ.P. 12(b)(1) because, having failed to satisfy the "by reason of" requirement under 18 U.S.C. § 1964(c), the EC lacks standing to bring its civil RICO claim. I have also concluded that dismissal of the EC's state-law claims is warranted because diversity jurisdiction is lacking. Thus, as of the filing the EC's complaint, this court was powerless to adjudicate its federal and state law claims. Under these circumstances, Plaintiff's motion to amend amounts to an effort at creating "an entirely new jurisdictional basis to provide competence in a court which lacked authority over the case *ab initio.*" *Falise v. Am. Tobacco Co.*, 241 B.R. 63, 67 (E.D.N.Y.1999) (denying leave to reinstate and amend original complaint to assert civil RICO claim following dismissal of complaint asserting only state law causes of action for lack of subject matter jurisdiction).

I note that this outcome is the same, whether Plaintiff's motion is construed as a motion to amend pursuant to Rule 15 or, as Defendants suggest, the motion is gov-

erned by Rule 21. (*See* Defs.' Mem. in Opp. to Mot. to Amend EC Compl. at 5 n. 1.) "While ... various rules [i.e., Fed. R.Civ.P. 15, 20 and 21] regulate this motion, there is in practical terms little difference between them.... [A]ll leave the decision whether to permit or deny amendment to the district court's discretion." *Savine–Rivas v. Farina,* No. CV–90–4335 (CPS), 1992 WL 193668, at *1 (E.D.N.Y. Aug. 4, 1992) (internal citations omitted). That discretion is severely constrained in this case by the Supreme Court's conclusion in *Newman–Green* that a complaint cannot be amended so as to alter defects in the jurisdictional facts in order to produce jurisdiction where none existed before. *See Newman–Green,* 490 U.S. 826, 831–32, 109 S.Ct. 2218, 104 L.Ed.2d 893 (holding that court of appeals may grant motion to dismiss dispensable non-diverse party whose presence spoils jurisdiction).

## IX. Conclusion

For the foregoing reasons, Defendants' motion to deconsolidate the above-captioned cases is GRANTED; Defendants' motion to dismiss the EC Complaint is GRANTED; Japan Tobacco, Inc.'s motion to dismiss the EC Complaint is DENIED as moot; and the EC's motion to amend its complaint is DENIED.

It is SO ORDERED.